# Richmond

## HENRY TERRY V. COMMONWEALTH OF VIRGINIA.

January 8, 1940.

Record No. 2216.

Present, Holt, Hudgins, Gregory, Browning, Eggleston and Spratley, JJ.

508

*Robert F. McMurran* and *Thomas H. Reid,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Walter E. Rogers,* for the Commonwealth.

EGGLESTON, J., delivered the opinion of the court.

This writ of error brings under review a judgment sentencing Henry Terry, a negro, to life imprisonment for the murder of Cecil Sivills, a white man, in accordance with the verdict of a jury.

There are several assignments of error but the view we take of the matter makes it necessary that we consider only one, which raises the question of the sufficiency of the evidence to sustain the verdict.

The Commonwealth's case depends almost entirely upon the testimony of Mrs. Daisy Brown Ward. Her story is as follows:

On Sunday, January 30, 1938, Cecil Sivills, a single man about thirty years of age, spent the afternoon and evening with her. Mrs. Ward had separated from her husband and was living with her father on Court street, in the city of Portsmouth. Sivills lived near by and they had been going together for several months.

During the afternoon they rode around the city in Sivills' car and later had supper at Mrs. Ward's home where they remained until about six o'clock. No one else was in the house with them.

After visiting Mrs. Ward's mother in the hospital and attending a moving picture theater, the couple set out in Sivills' car, about ten o'clock, for a drive. Mrs. Ward was at the wheel. They drove beyond the limits of the city of Portsmouth and to a suburb known as Glenshellah. There they left the main highway and drove into a lane which was hidden from the road by weeds and bushes. The lights

were turned off and they sat in the car talking. After they had been there about five minutes a man with a flashlight in one hand and a gun in the other tapped on the window and ordered them to get out of the car. Sivills got out and offered the man his pocketbook, telling him that there was no money in it. The man then commanded her to get out of the car and she obeyed. As she alighted from the car she saw from the flashlight on the man's face that he was a negro. She also saw that he was wearing "overall pants, an overall jumper and a long-beaked cap," and "dark goggles with white rims."

After she and Sivills had alighted the man reached in the car, removed the keys and placed them in his pocket. In doing this he partly turned his back to her and Sivills and was still holding both the flashlight and the pistol.

The man then marched them at the point of the pistol away from the car. As they walked, thinking that the man's motive was robbery, she removed $5.00 from her pocketbook and placed it in her hat. Sivills inquired of the man, "Where are you taking us?" The man replied, "Shut up or I will put this forty-five through you." After they had been marched a distance of "about two blocks" from the car the man commanded Sivills "to walk off and turn his back," at the same time signifying to Mrs. Ward in vulgar language his intention to attack her.

Continuing, she testified on direct examination as follows:

"I said, 'For God's sake, please don't do that to me,' and I started crying and pleading and talking to him, and he told Babe again to walk off and turn his back, and Babe wouldn't do it, and then he told him if he didn't do it he was going to kill him, and I still pleading and begging him not to make me do that, and he kept telling me to shut up or he would kill me, so he told Babe again and that time Babe started walking off while he made me get down on the ground, and I had just gotten on the ground and Babe had walked a distance away and he turned around and saw the negro start to me and said, 'No, for God's

sake, Daisy, let him kill me first,' and then he turned and run and then he ran away to get the negro away from me and to give me a chance to run, but I was so scared I didn't move. I stood there and I heard two shots, and when—I reckon one bullet hit him and he hollered, and at that time the negro came back by me running as fast as he could, and I don't suppose he saw me, but I thought he had gone and I got up and walked out where Babe had run and got down on my knees and started shaking and calling him and he didn't answer me, and I could see his eyes were back in his head, and just about that time I looked up and the negro had come back after me again and told me to get up and go over there to the bushes, and I got up and I walked over there and started pleading and begging him again, and he kept telling me to shut up and lie down, and while he was assaulting me he put his cap over my face and I shoved it off, and he put it on there again and told me if I didn't keep it on there he was going to kill me, and I pushed it off again and he told me the same thing. I was still pleading begging for him not to kill me, and he got up and I told him—my hat had fallen off where I was down there talking to Babe, and I told him to go over there and get that five dollars out of my hat. I was doing everything I could to get him away from me because I thought sure he would kill me, and then he went over that way and I was laying flat on my stomach on the ground scared to get up, and I watched him as he moved right off. I could see his form go in the opposite direction of what I went. I lay there and watched him until I could not see him any more and I got up and ran around like in the opposite direction and saw this light in this house and I headed for the house, and I went there and asked would they send for help."

Upon reaching this house, which was some 1300 feet from the place where Sivills' body was later found, she told her story and gave a description of her assailant. The county police were immediately notified and were on the scene in a few minutes, reaching there about eleven o'clock. Mrs.

Ward was rushed to the hospital in a hysterical condition for treatment.

It was dark and a drizzling rain had set in. At first the officers were unable to locate Sivills' body and Mrs. Ward was brought from the hospital back to the scene of the crime. With her assistance, and after a search of almost two hours, the body was found some 300 yards from the automobile. The deceased had been shot in the back with a 45-caliber pistol. Later two empty cartridges of the same caliber were found at the scene. Mrs. Ward's fur coat was found about 35 or 40 feet from the body.

Upon her return to the hospital Mrs. Ward was examined by a physician who testified that she showed evidence of recent intercourse. The body of Sivills, according to the testimony of the coroner, gave no such indication.

The accused was arrested on February 1st under circumstances which we will shortly relate, and was indicted at the April term of court. A trial at the May term of the court resulted in a hung jury. At the November term a jury found him guilty of murder in the first degree and fixed his punishment at life imprisonment.

The question we have to decide is whether the evidence for the Commonwealth, when analyzed, shows beyond a reasonable doubt the guilt of the accused. In our opinion it does not.

There is no evidence that the suspicion of any one was directed towards the accused as the guilty person until after his arrest. He did not live in the vicinity of the crime. He left at the scene no article or fingerprints or other evidence to connect him with the killing. No one except Mrs. Ward claimed to have seen him in that vicinity on the night in question. While the accused did not take the stand, both his common-law wife and their next door neighbor testified that he was at home at the time of the homicide.

At any rate, about 6:30 A. M. on Tuesday, February 1st, a county officer and two members of the Portsmouth police department called at Terry's home, in the city of Portsmouth. They did not have a warrant for his arrest charg-

·ing him with this or any other crime. While the record is not clear on the subject it was stated at the oral argument, and not controverted, that the officers went to Terry's home on the suspicion that he had committed some other offense.

When the officers arrived Terry was dressed and his wife was cooking breakfast. Terry escaped from the house and, while fleeing, was shot in the back by one of the officers and apprehended. Both he and his wife, the only occupants of the house, were immediately locked up.

At the time of his arrest Terry was wearing overall pants, a tan jacket, and a dirty, long-brimmed cap. The premises were searched and a pair of white-rimmed dark glasses were found in the house. Terry's wife testified that these belonged to her.

On April 18th, more than two months after Terry and his wife had been placed in jail, the officers again searched the premises and found in the yard under a pile of trash a rusty 45-caliber pistol. There is no evidence that the shot which killed Sivills came from this weapon, or that the empty cartridges found at the scene of the crime were fired therefrom. Neither is there any evidence that the pistol belonged to the accused or that he had ever owned such a weapon. Nor is it satisfactorily explained why this pistol was not found when the premises were searched at the time of Terry's arrest.

■ Under these circumstances we think the finding of the pistol on the premises of the accused has little, if any, probative value towards connecting him with the crime.

In the next place, we think the testimony of Mrs. Ward as to the circumstances under which the crime was committed is contrary to human experience and is inherently incredible.

The accused is a small colored man, while Sivills was a large man, five feet eight inches tall, weighing from 180 to 200 pounds, a former service man, and an athlete. It is inconceivable that Sivills would not have resisted to the utmost the attack of this man on his companion and him-

self. According to the testimony of Mrs. Ward, when the negro was in the act of removing the keys from the car he had his back partly turned to Sivills who was only five feet away from him. Moreover, it is difficult to understand how this man could have kept both Sivills and Mrs. Ward covered with a gun and a flashlight while he removed the keys from the car, as she claimed.

It will be recalled that Mrs. Ward testified that Sivills, in order to divert the attention of the negro, ran and that the negro followed him. Yet while this was taking place she made no outcry and made no effort to escape although it was dark and there were bushes, weeds and undergrowth in which she could easily have concealed herself. Indeed, her testimony is that it was so dark that the negro had difficulty in finding her again after he had shot Sivills.

Furthermore, she testified that after she heard the shots fired she went to Sivills, got down on her knees beside him and started calling him. Just where her assailant was at this time is not clear from her statement, but she had ample opportunity to have escaped then. Certainly she had no difficulty in making her escape after the negro had completed his attack upon her. He made no attempt to kill her or even to follow her.

Again, she said that when she returned to Sivills she "could see his eyes were back in his head," and yet her further testimony is that it was a dark night, the moon was not shining, and there were no artificial lights near by.

Moreover, the details of the alleged assault upon her are unbelievable. It is not necessary to discuss these other than to say that her testimony is that her assailant had intercourse with her without his body touching hers and while he was holding the pistol in his hand.

Then, too, it is difficult to understand how any one except a most depraved character could have completed an assault upon this woman in the presence of the dead body of her companion. Certainly there is nothing in the evidence to indicate that the accused was a man of this character. It is true that he was not married to the woman

with whom he was living but this relation had existed for several years and except for this he was, so far as the record shows, an orderly, peaceable and harmless individual.

It should be noted, too, that Dr. H. C. Henry, director of State Hospitals in Virginia, and for many years superintendent of the Central State Hospital for the Colored Insane at Petersburg, testified that he made a mental examination of Terry, and after applying standard tests found his mentality to be that of a six and one-half year old child. It was the considered opinion of Dr. Henry that the accused did not have the mental capacity to carry out the crime in the manner in which Mrs. Ward testified it was perpetrated.

■ We have said many times that we are not required to accept as true that which we know from human experience is incredible. This aptly characterizes the story of this witness. Certainly it is not sufficient, we think, upon which to base a verdict of murder in the first degree.

■ But this is not all. We think the evidence fails to show that Mrs. Ward identified the accused beyond a reasonable doubt as the perpetrator of this crime. According to her story, as she got out of the car she saw from the flashlight that the intruder was a short negro, and she was able to describe the manner in which he was dressed. She does not pretend to have recalled his features. Indeed, there is strong evidence that shortly after the commission of the crime she gave conflicting descriptions of the man who had killed her companion.

On February 23rd she was taken to the jail for the purpose of identifying, if possible, the accused, who was placed in a line up with six other colored men of about the same size. Although she had seen Terry's picture in a local newspaper and knew that he was charged with the commission of the crime, she was unable to identify him either by his appearance or from his voice.

On March 8th she was given another opportunity of identifying the accused. At the jail she was confronted with a line up of five men about the same size and each

clothed in the manner in which she said her assailant was dressed at the time of the commission of the crime. She looked over each man, smelled the caps of each, heard each of them speak, and yet gave no indication of having identified the guilty party. Upon her request she was taken from the room where the men were lined up and in the hallway stated* that the third man in the line up, which happened to be the accused, was the guilty party. Later she testified she was able to identify him by the peculiar odor of his cap.

It is true that at the second trial, in response to the question as to "whether or not this man sitting here, Henry Terry, is the one who shot Sivills that night out on the golf course," the answer was, "He is the one." She did not explain upon what she based the identification at this particular time. Certainly it could not have been her recollection of the man's features, because she claimed to have had but a glimpse of his face on the night of the crime and was then only able to observe that he was a negro. And, as we have just seen, on two occasions previous to the trial, she had been unable to identify him from his appearance. This was the second trial of the accused, and after what had taken place since the commission of the crime it could hardly be expected that she would fail to identify him in this setting and in response to such a question. Certainly this identification was worth little towards showing that the accused was the guilty party.

The burden was on the Commonwealth to prove the identity of the accused beyond a reasonable doubt. *Waller & Boggs* v. *Commonwealth*, 84 Va. 492, 496, 5 S. E. 364; *Goldman* v. *Commonwealth*, 100 Va. 865, 878, 42 S. E. 923. In our opinion the evidence falls short of such requirement.

We are not unmindful that the accused has been found guilty by a jury and that ordinarily the sufficiency of the evidence and the credibility of the witnesses are for them.

*As to the admissibility of such a statement the authorities are in conflict. See Wigmore on Evidence (2d Ed.), section 1130; 70 A. L. R. 910, and note.

But here there is a combination of circumstances which casts the gravest doubt, to say the least, upon the guilt of the accused and the correctness of the verdict.

To summarize, we point out the following inherently weak points in the Commonwealth's case against the accused:

(1) The lack of evidence, aside from the testimony of a discredited witness, connecting the accused with the crime;

(2) The inherent incredibility of the story of the principal witness as to the circumstances surrounding the commission of the crime;

(3) The circumstances surrounding the arrest of the accused, and the fact that he was not charged with the commission of the crime until he had been shot by the officers who sought to detain him for the supposed commission of some other offense.

(4) The finding of the pistol on the premises of the accused more than two months after the arrest and confinement of the accused and his wife, and the fact that upon a previous search of the premises the weapon was not found;

(5) The conflicting descriptions given by the principal witness for the Commonwealth of her assailant shortly after the homicide;

(6) The failure of the principal witness to identify the accused at the first line up either by his appearance or voice;

(7) The doubt cast upon her identification at the second line up when she failed or refused to identify the accused in his presence.

For these reasons the verdict of the jury is set aside, the judgment is reversed, and the case is remanded for another trial if the Commonwealth be so advised.

*Reversed.*