## Richmond

JOHN DUDLEY ROBINSON v. COMMONWEALTH OF VIRGINIA.

March 5, 1956.

Record No. 4511.

Present, Hudgins, C. J., and Eggleston, Spratley, Buchanan, Smith and Whittle, JJ.

The opinion states the case.

*Sacks & Sacks*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *Thomas M. Miller, Assistant Attorney General*, for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

The defendant, John Dudley Robinson, was tried by a jury on an indictment charging him with the rape of Juanita Snyder. Code § 18-54. He was found guilty and his punishment fixed at life imprisonment. The court overruled his motion to set aside the verdict and sentenced him in accordance with the finding of the jury. Under his assignments of error on this appeal he contends that the Commonwealth did not prove the venue of the offense; that the evidence was not sufficient to support the verdict, and that the court erred in admitting the testimony of a witness for the Commonwealth. We look first to the sufficiency of the evidence.

The prosecutrix, Mrs. Snyder, twenty-seven years old and the mother of three children, lived on Pall Mall street, in Norview, Norfolk county, and at the time of the offense she was working at People's Drugstore in Lakeland Shopping Center, where she had been employed since the previous March.

She testified that on Thursday night, May 20, 1954, she got off from work about 10:05 p.m. and started walking home on the right-hand side of Bell's Road. The other stores were closed, there were no other people on the street, and when she had reached the last house of the Lakeland apartments, where there was some light from a street lamp, a car pulled up, stopped beside her and one of its occupants asked her a question. She looked around, saw they were two Negroes and started to run but dropped her package. As she stopped to pick it up one of the men, who was sitting beside the driver, jumped out of the car and grabbed her. In the ensuing struggle he tore her dress, knocked out some of her teeth and pulled her into the car, shut the door several times on her foot, causing it to bleed, and the car drove ahead on Bell's Road.

After getting her into the car its occupants held her head down between their legs and hit her with their fists when she tried to rise up. She begged them to take her money and let her go, but they ordered her to shut up and threatened to kill her. After making about four turns, the car pulled off the road and into a field. There they made her get into the back seat and take off her clothes. One held her while the other had intercourse with her. She thought she fainted once when the one she afterwards identified as the defendant, who was the driver of the car, pulled her head back and hurt her. They heard someone drive by and pulled farther out into the field toward some lights, where they attacked her again. Each one had

intercourse with her three times. She said she cried so much her throat was sore and all she could do was pray. They were drinking.

Afterwards they put her in the back seat of the car behind the driver and started back. She was required to keep her head down and the younger man, not the defendant she said, sat beside her with a rock in his hand with which he threatened her if she rose up or said anything. She kept asking them to let her out, stating that she knew her way home, but they said they would take her home. They came to an intersection and started down the Military Highway, where she recognized some signs and places. She thought they rode seven or eight miles, maybe farther, in going back. They put her out on Bell's Road, about a block and a half from where they had picked her up. They told her not to say anything or they would come back and get her. This was about twenty to twenty-five minutes after eleven, she said.

She walked and crawled back home, where her mother, with whom she lived, attended her and then called the police, who came and took her to a hospital where she was treated. On leaving the hospital that night the police took her out to see if she could locate where she had been.

The following day, May 21, about noon, a police officer saw the prosecutrix at her home. He testified that she was bruised and the left side of her face and her mouth were badly swollen. Her legs were swollen, bruised and stiff. He wanted her to go with him to try to identify the place, but she could not walk by herself and had to be helped to the car. She was in a very nervous condition. They rode all around the general vicinity of the Municipal Airport but she was not then able to identify the place. Afterwards she went several times to see if she could locate where she had been. Still later a police officer and a State trooper took her to a place she described to them as being where the offense occurred, and which she said was around the airport in Norfolk county, she supposed, but the officers testified it was in Princess Anne county.

On July 14, 1954, Mrs. Snyder, in company with a police officer, went to the Norfolk county jail where the defendant was being held on another charge. Her mission was to see if she could identify him as one of her assailants. The defendant was put in a line-up with nine other men, two or three of whom were of defendant's height and color. She was asked to say nothing to anyone but to

stop in front of each man, look him over carefully, then come outside and report. This was done at least twice and each time she identified the defendant, Robinson, as being one of the men who attacked her. She testified that she knew him as soon as she saw his face and his big build. She was asked on cross-examination if when she saw this man in the line-up she could possibly have been mistaken about the face she saw the night of the attack. She replied that it was not possible; that she could see his face in the light from the airport when she had to face him each of the three times he had assaulted her and made her kiss him, and she could not be mistaken. She also pointed him out in the courtroom at the time of the trial without hesitation.

He was the driver of the car, she said, and while in the car she had looked it over to see if there was anything she could identify about it. She did not know its make, but said it was a dark car with leather upholstering, the top light had been torn out and there were some stickers of what appeared to be a rooster in the front of the car. She saw this car afterwards, she said, at the defendant's home, where she identified it in the presence of Police Officer Struncius, his wife and State Trooper Coffman.

After her identification of the defendant at the jail, Officer Struncius asked him if he owned a car. He replied that he owned an old Chevrolet, he didn't know whether it was blue or green but decided it was green. That night Mrs. Snyder went with Struncius, his wife and Trooper Coffman to the defendant's home, examined the car and the officers testified that it corresponded with her description as to color, upholstering and ceiling light. The trooper testified she looked the car over very thoroughly before identifying it.

The defendant's half brother was at defendant's home that night. Mrs. Synder thought she recognized his voice and that he was one of the men who had assaulted her. He was questioned by the police but later released and she admitted that she was mistaken about him.

The defendant testified that he was thirty-six years old and had been employed for seven years at the Monsanto Chemical Plant, in Norfolk, and had not been arrested before except once on a minor charge; that on the afternoon of May 20 he took his wife, who had been ill, to a hospital and brought her back home about four o'clock; that he then had a headache and lay down across the bed

and went to sleep and slept until he was awakened about a quarter of twelve. His time card at the plant showed that he checked in for work at 11:56 that night.

The Commonwealth proved that from the place where the prosecutrix testified that the defendant and his companion let her out of the car after the attack at about 11:20 or 11:25 that night, the distance to the Monsanto Plant was between a mile and a quarter and a mile and three-quarters.

The company's record showed that defendant last worked at the plant on May 18 from 4:00 p.m. until 12:00 on the third shift. The prosecutrix testified that her assailants discussed the fact that they had not worked the night before and would get fired if they did not work that night.

Defendant's wife testified that he went to sleep right after supper on May 20 with his clothes on and didn't get up until she woke him at eleven o'clock and he left the house at 11:50; that he usually left at 11:30 but "We overslept ourselves."

Defendant's mother testified that she had been in the home since April because of her daughter-in-law's illness and was there on the night of May 20; that the defendant was at home that day from four o'clock in the afternoon until sometime between 11:30 and 12 that night. He told her to wake him up at 11:30 so he could go back to work, and she told him that if she was awake she would. She waked up around 11. She said his wife was asleep also when the time came to wake him up. She said that was the only time she ever knew the defendant to oversleep.

There is ample evidence to sustain the conclusion that the prosecutrix was attacked as she related. Her physical condition, the marks on her body seen and their effects witnessed by the officer next day, and her detailed account of the matter from its beginning to its end, uncontradicted on this element of the case, sufficiently established that the crime was committed.

The evidence also was sufficient to support the conclusion of the jury that this defendant was one of the perpetrators of the crime. At a place identified by her as the scene of the offense, and under the conditions described by her, it was shown by three of the officers that there was sufficient light to permit identification. In particular the trooper testified that at that point at a similar time of night there was sufficient light from the airport to enable him to distinguish between a man and a woman at a distance of between fifty and seventy-five yards, and he could get a good view of a

face from three to six feet away. The prosecutrix positively identified the defendant as one of her attackers, both in the line-up and in the courtroom. Under a searching cross-examination she did not falter or hesitate on that point, but gave convincing reasons for her certainty.

The guilt of the accused depends mainly, of course, upon the credibility of the prosecutrix. That is usually true in cases of this kind because there is rarely an eye-witness to such an offense other than the persons immediately involved. Corroboration of the prosecutrix is not essential, else most of such offenses would go unpunished. We have repeatedly held that if the testimony of a prosecutrix is credible, it is alone sufficient to sustain a conviction of rape if the guilt of the accused is believed by the jury beyond a reasonable doubt. *Addington* v. *Commonwealth*, 161 Va. 975, 170 S. E. 565; *Taylor* v. *Commonwealth*, 180 Va. 413, 23 S. E. (2d) 139; *Young* v. *Commonwealth*, 185 Va. 1032, 40 S. E. (2d) 805; *Davis* v. *Commonwealth*, 186 Va. 936, 45 S. E. (2d) 167. Standing alone, the testimony of the prosecutrix here is not incredible. It is supported in a material degree by facts and circumstances shown by other evidence. From a careful analysis of all the evidence we are convinced that it clearly presented a question for the jury to decide, and we are not at liberty to disturb its verdict finding the defendant guilty as charged.

This case differs materially from *Terry* v. *Commonwealth*, 174 Va. 507, 6 S. E. (2d) 673, where identification was by a discredited witness who gave conflicting descriptions of her assailant, was unable to identify him in the first line-up and whose identification at his second line-up was of doubtful validity.

■ The assignment on the proof of venue is not substantial. Evidence to prove venue may be direct or circumstantial, and the facts proved may be aided by judicial notice of geographical facts that are matters of common knowledge. *McClain* v. *Commonwealth*, 189 Va. 847, 853, 55 S. E. (2d) 49, 52. Here the evidence alone was sufficient to establish that the crime was committed in Princess Anne county where the defendant was tried.

The prosecutrix described the course of travel from the place where she was seized to where she was brought back, and identified some of the roads and some of the places. She said they took her into a field toward some lights. She testified that these lights were from the airport; that the place they took her was out at the air-

port, and "If that is Princess Anne County, then that is where it was." She went with Officer Struncius and Trooper Coffman and showed them the place where she said it happened. The former testified that the airport was in Princess Anne county and that the place to which she directed them was in Princess Anne county and at least a half mile from the Norfolk county line. The trooper testified that Mrs. Snyder pointed out the place where it occurred, which was about two hundred yards from the red warning lights on the poles at the airport, and it is also plain from his testimony that the place was in Princess Anne county.

The final assignment is to the admission of the testimony of Officer Brady about the lights around the airport. The point of the objection was that this witness did not describe any specific lights, did not know where the scene of the crime was, and his evidence did not relate the lights he described to the place where the crime was committed. He testified that he had an airplane pilot's license and was very familiar with the airport and its lights and had been in and around the airport probably five hundred times in the last five years, and knew the character of the lights and the reach of their illumination at all times and in all kinds of weather, both from observation and from experience; that he had viewed these lights from the general area of this offense on numerous occasions and that on a cloudy night they would illuminate an area of at least one-half mile in any direction sufficiently to allow the driving of an automobile without headlights. He did not undertake to speak specifically as to the light at the scene of the crime on the night it was committed, but his evidence was clearly admissible as a description of the general situation in that area and no error was committed in receiving his testimony.

The evidence was sufficient to support the verdict, no prejudicial error in the trial has been shown, and the judgment of the trial court approving the verdict and sentencing the defendant in accordance therewith must therefore be

*Affirmed.*