## Richmond

BERNARD ROSS FOGG v. COMMONWEALTH OF VIRGINIA.

March 4, 1968.

Record Nos. 6715, 6716, 6717.

Present, All the Justices.

*Peter W. Rowe (Sterling W. Walker; Cowper and Rowe,* on brief), for plaintiff in error.

*D. Gardiner Tyler, Assistant Attorney General (Robert Y. Button, Attorney General,* on brief), for defendant in error.

EGGLESTON, C.J., delivered the opinion of the court.

This is a companion case to *Brickhouse* v. *Commonwealth,* 208 Va. 533, 159 S. E. 2d 611, decided today. According to the record in the present case, Bernard Ross Fogg, a Negro, was indicted at the

October, 1966 term of the court below for the rape and robbery of Vera Lynn Shaw, a white woman.[1] At the November term he was indicted for the abduction of the prosecutrix. On November 22 the defendant pleaded not guilty to each of the charges, by consent a jury was waived, and he was tried by the court. Upon consideration of the evidence adduced the trial court announced its decision, finding the defendant guilty on all three charges and entered an order to that effect. Subsequently it sentenced the defendant to death upon the charge of rape and to imprisonment in the State Penitentiary on the other charges.

Through court-appointed counsel the defendant has appealed, claiming that (1) the finding of the trial court is contrary to the law and the evidence and insufficient to sustain a conviction, because "the identification of the defendant was not clear, positive and convincing" and "was based upon an improper and unlawful method of identification;" (2) the court erred in sentencing the defendant to death, because "the courts of the Commonwealth of Virginia have manifested a fixed and continuous policy of unjust, arbitrary, and discriminatory administration of the laws under which the death sentence for the crime of rape" is applied only to persons of the Negro race, in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States; and (3) the imposition of the death penalty for rape constitutes a cruel and unusual punishment, in contravention of the Constitution of Virginia and the Constitution of the United States.

The evidence on behalf of the prosecution shows that Vera Lynn Shaw, age nineteen, resided on West Thirtieth Street in the City of Norfolk. On Sunday, July 24, 1966, about 5.00 A. M., she left her home for the purpose of catching a bus at Granby and Twenty-first Streets which would take her to the place of her employment, a restaurant near the Naval Operating Base. After walking eastwardly along Thirtieth Street she turned and walked southwardly down Granby Street. As she passed Twenty-eighth and Granby Streets she heard voices and laughter which attracted her attention to a house on Twenty-eighth Street, a short distance from Granby. Looking in that direction she saw three men on the porch. As she continued down Granby Street she saw two of the men coming off the porch and following her. One of the men, later identified as Elvin Brick-

---

[1] This defendant had been previously charged with rape and robbery in separate warrants issued on July 25, 1966. At a preliminary hearing on September 29 he was ordered held for the grand jury.

house, Jr., was on the same side of the street along which she was walking while the other, later identified as the defendant Fogg, was on the opposite side.

She testified that when she reached Twenty-second and Granby Streets, Brickhouse "came up from behind and dragged me down. He put his hand over my mouth and knocked me down, and then the other one, Fogg, * * * came running across the street" and joined in the assault. She pleaded with her attackers, saying, "Please take anything you want, money, but please leave me alone." Brickhouse replied: "We aren't going to hurt you," and commanded in foul language that she shut her mouth. During the assault her pocketbook, containing $2.60, fell out of her hand and was picked up by Fogg.

After she had been knocked to the ground and beaten in this manner she was dragged by the two men to the rear of a near-by warehouse. There her assailants, despite her screams, tore off her clothes and raped her, Fogg first and then Brickhouse. After completing their sexual attack the two men ran from the scene toward the direction of her home on Thirtieth Street.

The prosecutrix, with only a blouse to cover her nude person, ran along Twenty-second Street to the next intersection and thence to Twenty-first Street. There she fell in the street and was seen by M. J. Deans, a passing motorist, who, at her request, took her to the Norfolk General Hospital.

Dr. Karl Opderbeck testified that he examined the prosecutrix shortly before 6:00 A. M. on the day of the attack. He said that she was "extremely upset and crying" and stated that she had been beaten and raped about 5:00 o'clock that morning. An examination showed that she had been "severely beaten around the face with contusions and swelling about both eyes, the left eye being closed." He took smears from her vagina and turned these over to the police. A subsequent examination of the smears showed that they were positive for seminal fluid.

Marvin J. Hawk, a witness for the prosecution, testified that he lived at 106 West Twenty-eighth Street which is across the street from the "Top Hat Snack Bar;" that he (Hawk), Brickhouse and Fogg were seated on his porch during the early morning of July 24, 1966, and had been there since the snack bar had closed, around 2:00 A. M.; that when "it was getting morning" he and his companions left the porch; that he went to bed and Brickhouse and Fogg "went back across" Twenty-eighth Street. On direct examination he

said that while he had not known Fogg previous to that night he positively identified him as one of the two men who had been on his porch during the night and had left early the next morning.

On cross-examination this was developed:

"Q. You don't know this man, do you?

"A. I said that night was the first time I ever saw him. No, I definitely don't know him.

"Q. You are not even sure this was the man you saw, are you?

"A. I wouldn't stake my life on it, no.

\* \* \* \*

"Q. So you tell His Honor you are not certain this was the man?

"A. That is the first time I saw the man that night, as I said before.

"Q. But you are not sure it was this man?

"A. I wouldn't stake my life on it, no."

The prosecutrix testified that while she was in the hospital she gave police a description of the two men who had attacked her and told them that they were "colored males," both "neatly dressed," and one wore a beret. She further testified that while in the hospital the police showed her several pictures of suspects and later she was shown a picture of the defendant Fogg. From these pictures she was unable to identify Fogg as one of her assailants. As she explained, "I can't tell hardly anything from pictures, but when I see a person, I can tell if that is the person." She said that she was present at the preliminary hearing on September 29, 1966 and when the defendant Fogg was brought into the room she immediately identified him and said to her companion, Mrs. Horn, "That is him!"

At the trial in the Corporation Court she was confronted by the defendant and thus clearly and positively identified him as one of her assailants:

"Q. Miss Shaw, do you here today tell His Honor that this is the man?

"A. Yes."

Doris Jackson, a sister-in-law of the defendant Fogg, and her husband, John Jackson, Jr., called as witnesses for the defendant, testified that the defendant spent the night of Saturday, July 23, 1966, in their home at 209 West Twenty-eighth Street. When they returned to their home about midnight they found the defendant asleep on a couch in the living room. Upon their insistence, about 2:00 o'clock in the morning, the defendant left the couch and went to sleep in a bedroom in which the couple's eleven-year-old son was

sleeping. Mrs. Jackson said she next saw the defendant between 6:30 and 7:00 A. M. when he helped her prepare breakfast. Jackson testified that he left home about 8:00 A. M. without seeing the defendant again after the latter had retired about 2:00 A. M.

The eleven-year-old son testified that he saw the defendant sleeping on the couch in the living room and later come into the room where he, the child, was sleeping, and slept there the remainder of the night. "A little before daybreak," he said the defendant prepared a bottle for the baby who had become restless. Thereafter, in the morning, he said, the defendant fed the baby and gave him a bath, and then put on his clothes and departed. On cross-examination the child admitted that he was not certain of the day or the time the defendant came into his room.

The defendant testified that he was twenty-two years old and that in July, 1966 he was in the service and stationed at the United States Naval Air Station at Patuxent, Maryland. While married, he was not then living with his wife. He said that on Saturday night, July 23, 1966, "around 12 o'clock," he went to bed at the home of his sister-in-law, Mrs. Jackson, and "was sleeping off a drunk." He corroborated the testimony of his sister-in-law and her husband that about 2:00 A. M., at their insistence, he left the couch in the living room where he had been sleeping and went to bed in the room then occupied by his nephew. He said that he stayed in the bedroom until he got up, between 6:30 and 7:00 that morning, and helped his sister-in-law prepare breakfast. During the early morning, he said, he had prepared a bottle for the baby.

The defendant admitted that he knew Brickhouse whom he had seen at the Top Hat Bar across the street from the Hawk residence. Indeed, he said, the Jackson house where he spent the night was "just a short distance away," that is, "a block and a half," from the Top Hat Bar and the Hawk residence. However, he said that he was not acquainted with Hawk, had never seen him until the day of the trial, and was not at the Hawk residence with Brickhouse and Hawk during the night and early morning on which the attack occurred.

Evidently the trial court was not impressed with the alibi defense. Aside from other weaknesses, it shows on its face that the defendant was in the vicinity of the crime at the time of the alleged attack.

[1] The defendant concedes that the evidence is sufficient to warrant the finding that the prosecutrix was cruelly beaten and sexually

attacked. But he insists that his identification as an assailant of the prosecutrix was not "legally sufficient or proper."

It is, of course, true that in a prosecution for rape the burden is on the Commonwealth to prove the identity of the accused beyond a reasonable doubt. *Terry* v. *Commonwealth*, 174 Va. 507, 516, 6 S. E. 2d 673, 677 (1940), and cases there cited; *Brickhouse* v. *Commonwealth, supra*, 208 Va. at 536, 159 S. E. 2d at 613, 614. The sufficiency of the evidence to establish such identity is a question for the trier of the fact—the jury or the trial court sitting as a jury. *Shields* v. *Commonwealth*, 147 Va. 640, 644, 136 S. E. 495, 496 (1927); *Booth* v. *Commonwealth*, 165 Va. 794, 798, 183 S. E. 257, 259 (1936); 23A C. J. S. Criminal Law § 1126, pp. 276, 277.

In its finding of facts establishing the guilt of the defendant the trial court stated that although there had been "some quibbling about the pictures," it accepted as true the testimony of the prosecutrix in such identification. It commented that "her demeanor, attitude, sincerity, is such that she is not willing to rely on photographs. I don't blame her. I wouldn't either." "I haven't any trouble at all in accepting her testimony and I do accept it and I find him [the defendant] guilty of rape as charged in the indictment."

We have repeatedly held that corroboration of the prosecutrix in a rape case is not essential and that her testimony alone is sufficient to sustain a conviction if it is credible and the guilt of the accused is believed by the jury beyond a reasonable doubt. *Robinson* v. *Commonwealth*, 197 Va. 754, 759, 91 S. E. 2d 396, 399 (1956), and cases there collected. However, in the present case there is evidence which tends to corroborate the prosecutrix. The testimony of Hawk, though weakened somewhat on cross-examination as has been said, shows that this defendant was one of the two men who left the Hawk residence and followed the prosecutrix down the street shortly before the assault. The testimony of the defendant himself shows that he spent the night in the vicinity where the crime was committed.

The defendant contends that his conviction was invalid because, he says, he was denied due process of law in the manner in which he was identified by the prosecutrix. He argues that he was not selected by her out of a police line-up; that she was unable to identify him from a number of photographs exhibited to her; that her identification was made "only as a result of the prompting and presuggestion by the police and the Commonwealth's Attorney," and thus was based, "at least in part, upon hearsay."

We do not agree with this contention. We are fully aware of the

principle that the manner in which an accused is confronted by his victim may be so suggestive of his identification as to run afoul of the due process requirement of the Constitution of the United States. *Stovall* v. *Denno,* 388 U. S. 293, 302, 87 S. Ct. 1967, 1972, 18 L. ed. 2d 1199 (1967). But we are convinced that there is no such infirmity in the identification of the defendant by the prosecutrix in the present case.

While a police line-up is recognized as one of the reliable methods of identifying an accused as the perpetrator of a crime or crimes, we are aware of no principle under which he is constitutionally entitled to such a line-up.

It is true that in their effort to identify her assailants the police showed the prosecutrix a number of photographs. But it cannot be said that these were suggestive of the identity of the accused, because, as she said, she was not able to identify him from any of them.

In the brief of the defendant we find this statement: "[T]he record in the present case shows that the identification of the accused by the prosecutrix was made only as a result of the prompting and pre-suggestion by the police and the Commonwealth's Attorney." Again it is said: "Just prior to the police bringing the accused, Fogg, before the police justice, the Assistant Commonwealth's Attorney [Mr. Morrison] whispered to Miss Shaw, the prosecutrix, 'The next man the police bring through that door will be the man in those pictures.' "

As the basis for these statements the brief refers to the fact that on cross-examination the prosecutrix was asked: "Didn't Mr. Morrison whisper to you in police court that, 'The next man the police bring through that door will be the man in those pictures I just showed you?' He said that, didn't he?" to which she replied: "I can't remember him doing it. He might have, but I can't remember it."

It is argued that this answer of the prosecutrix was an implied admission that she had been forewarned by the Assistant Commonwealth's Attorney that the defendant was about to enter the courtroom and that this suggestion led to her identification of the defendant.

The trouble with this contention is that it ignores the clear and positive testimony of the prosecutrix to the contrary. She was further asked on cross-examination: "Isn't it a fact that your only basis for identification is what Officer Huffman and Mr. Morrison told you?" to which she replied: "No. My basis for identification is his face in mine."

The prosecutrix had previously stated on both direct and cross-

examination that she recognized this defendant as one of her assailants because, as she said, "When I was being raped, I could see it all. Their faces were right in mine." And, again, "I was sure because, like Brickhouse, his face was right in mine. How could I forget it?"

Since this testimony of the prosecutrix has been accepted by the trial court and is not incredible, its finding is conclusive on this appeal. *Shields* v. *Commonwealth, supra,* 147 Va. at 644, 136 S. E. at 496; *Booth* v. *Commonwealth, supra,* 165 Va. at 798, 183 S. E. at 259; *Brickhouse* v. *Commonwealth, supra,* 208 Va. at 536, 159 S. E. 2d at 614.

[2] The defendant next contends that the judgment of the trial court sentencing him to death should be reversed, because he says, "the courts of the Commonwealth of Virginia have manifested a fixed and continuous policy of unjust, arbitrary, and discriminatory administration of the laws under which the death sentence for the crime of rape" is applied only to persons of the Negro race, in violation of the Fifth and Fourteenth Amendments to the Constitution of the United States.

The principal basis of this contention is the reference in the defendant's brief to an article in the Washington and Lee Law Review, Vol. XXII, p. 43 (1965), entitled "The Incidence of the Death Penalty for Rape in Virginia." In this article there are collected statistics, said to have been compiled from the records of the Virginia State Penitentiary, which the author says show that from 1820 through 1964 the death penalty in rape cases has been reserved for members of the Negro race.

We dealt with a similar assignment of error in *Brickhouse* v. *Commonwealth, supra.* We there pointed out that the burden of proof was on the defendant to prove such alleged discrimination and that where the record in the trial court was devoid of such proof such assignment of error must fail. What was said in that case need not be repeated here. Suffice it to say that since the record in the present case is likewise devoid of such proof of discrimination, the similar assignment of error in the present case should be, and is, overruled.

[3] The final contention of the defendant is that the imposition of the death penalty for rape constitutes cruel and unusual punishment, in contravention of the Constitution of Virginia and the Constitution of the United States.

In *Hart* v. *Commonwealth,* 131 Va. 726, 739, 740, 109 S. E. 582 (1921), we fully explored and denied such contention. We are now asked to overturn that ruling because three justices of the Supreme

Court of the United States, in dissenting from the majority's denial of certiorari in *Rudolph* v. *Alabama*, 375 U. S. 889, 84 S. Ct. 155, 11 L. ed. 2d 119 (1963), thought the court should inquire into whether the infliction of the death penalty in a rape case was cruel and unusual punishment proscribed by the Federal Constitution. In denying the writ the remaining six justices thought the matter did not merit such inquiry. We do not regard the views of the three dissenting justices as sufficient ground for overturning our holding in *Hart* v. *Commonwealth, supra,* that capital punishment for rape is not a cruel and unusual punishment condemned by the Constitution of Virginia and the Constitution of the United States. To the same effect see, *State* v. *Gamble*, 249 S. C. 605, 155 S. E. 2d 916, 917 (1967), and *Sims* v. *Balkcom*, 220 Ga. 7, 136 S. E. 2d 766, 769 (1964). Accordingly, this assignment is overruled.

The judgments are

*Affirmed.*

GORDON, J., Dissenting.

Before *Stovall* v. *Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.ed.2d 1199 (1967), I would have agreed with the majority of this Court that the circumstances under which the prosecutrix identified Fogg raised not a constitutional issue, but only a jury issue. In my opinion the reasoning of the majority opinion in *Stovall* requires a holding that Fogg was denied due process of law as guaranteed by the Fourteenth Amendment.*

In *Stovall*, the Court said: "The practice of showing suspects singly to persons for the purpose of identification, and not as part of a line-up, has been widely condemned. However, a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it . . .". *Id.* at 302, 87 S.Ct. at 1972, 18 L.ed.2d at 1206.

Mrs. Behrendt (a victim of the crime allegedly committed by Stovall) identified Stovall when he was brought to her hospital room soon after the crime, handcuffed to a police officer. The Supreme Court held this confrontation consistent with due process, but only because "an immediate hospital confrontation was imperative". *Id.*

Mrs. Behrendt was the only person who could have exonerated Stovall, and no one knew how long she might live. The police fol-

---

*As recited in the majority opinion in this case, Fogg's counsel raised the constitutional issue, relying upon *Stovall* v. *Denno, supra.*

lowed the only feasible procedure when they took Stovall to her hospital room. The Court pointed out that under those circumstances, " 'the usual police station line-up, which Stovall now argues he should have had, was out of the question' ". *Id.* at 302, 87 S.Ct. at 1972-73, 18 L.ed.2d at 1206.

Miss Shaw identified Fogg when policemen brought him into the courtroom where she was sitting, awaiting his preliminary hearing. Not only was Fogg identifiable as the person accused of the crime, because the police brought him in; the record does not show that any other Negro was in the courtroom. So Mrs. Behrendt's and Miss Shaw's identifications were made under similar circumstances. In each case the person to be identified had been singled out as the person accused of the crime. But the similarity between Stovall's and Fogg's cases ends there.

The record in this case affords no reason, much less an imperative reason, why the Commonwealth chose Fogg's preliminary hearing and the courtroom as the time and place of the first confrontation between Fogg and Miss Shaw. There is no explanation why the Commonwealth did not give Miss Shaw the opportunity, before Fogg's preliminary hearing, to identify him in a lineup or under other circumstances that did not single him out as the person accused of the crime.

Believing myself bound by the views of a majority of the Supreme Court, I would reverse the convictions and remand the cases for new trials.