COURT OF APPEALS OF VIRGINIA


Present:  Judges Baker, Willis and Overton
Argued at Norfolk, Virginia


DORIS LUCRESS

v.        Record No. 2638-94-1        MEMORANDUM OPINION[*]
                                     BY JUDGE JOSEPH E. BAKER
COMMONWEALTH OF VIRGINIA                  JULY 2, 1996


          FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                       John K. Moore, Judge

          Gerard T. Schafer (Schafer & Russo, P.C., on
          brief), for appellant.

          Michael T. Judge, Assistant Attorney General
          (James S. Gilmore, III, Attorney General, on
          brief), for appellee.


     Doris Lucress (appellant) appeals from a judgment of the

Circuit Court of the City of Virginia Beach (trial court) that

approved jury verdicts convicting her of two counts of abduction

in violation of Code § 18.2-47, two counts of robbery in

violation of Code § 18.2-58, and use of a firearm in the

commission of a felony in violation of Code § 18.2-53.1.  On

appeal, appellant argues that the trial court erred in refusing

to suppress (1) a statement she made to the police and (2) a

witness's voice identification of appellant.  Appellant asserts

that the statement was involuntarily given and that the

identification was impermissibly tainted.  Finding no error, we

affirm the judgment of the trial court.

---

[*]Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

Facts

The trial court having denied the motion to suppress, we view the evidence in the light most favorable to the trial court's decision. Brown v. Commonwealth, 15 Va. App. 1, 7, 421 S.E.2d 877, 881 (1991). Viewed accordingly, the record discloses that on July 25, 1993, Patricia Marie Steele (Steele) and Kathryn Martin Henshaw (Henshaw) were working at the Linen Warehouse (the store) in Virginia Beach. Robbin Marlar (Marlar), the store's security guard, was also working that day. At approximately 6:00 p.m., closing time, the last customer left the store, and all the employees, except Steele, Henshaw, and Marlar, left the building by 6:25 p.m. The doors of the building were secured and Henshaw and Steele began the process of totaling the day's receipts.

Steele took the money from the cash registers back to the cash office and locked the door. Steele put the money away while Henshaw was coming back to the office. Marlar told Steele she could "unlock the door now. There's no one else here." Steele said "No," that it was store policy to keep the door locked at all times. Steele did open the door, however, to let Henshaw into the office. Steele and Henshaw began to "double-check" the day's figures to make sure they were correct.

While Steele was sitting with her back to the door, working on re-checking the figures, she heard the door open and heard Marlar say "this is where you work . . . I've never been in here." As Steele turned to answer Marlar, she saw a gun coming

over Marlar's shoulder and heard a voice say, "Give me the money." Steele froze for a second and then began to concentrate on the person with the gun to get as detailed a description of her as she could. The person holding the gun was a woman "disguised completely from head to toe." Henshaw knew it was a woman because of the voice. Steele also knew the person was a woman because of her "size and build . . . . Plus the main reason . . . was the voice." The woman told Steele and Henshaw to turn around and face the wall, which they did, and then told Marlar, "Give me the money. Give me the money." Marlar told the woman she did not have the money "and the person again said, 'Give me the money.'"

Steele asked the woman if it was okay for her to get up and get the money from the safe. The woman responded, "Of course." Steele opened the safe and handed the woman seven bags which contained approximately $8,000. The woman then told Marlar to handcuff Steele. Marlar handcuffed Steele's hands behind her back and then was given a second pair of handcuffs to handcuff Henshaw. Next, the woman gave Marlar a roll of duct tape and told her to tape Steele's and Henshaw's eyes and mouths shut. Marlar taped Steele's eyes and mouth first. Steele then heard the woman tell Marlar to put the tape across Henshaw's eyes and mouth. Next, the woman instructed Marlar to tape Henshaw's ankles and told Steele to lie face down on the floor. Marlar taped Steele's and Henshaw's ankles together. The woman told

Marlar to get Henshaw's keys. Marlar removed the keys, and Steele heard the woman tell Marlar "You're coming with me," at which time the two left. Before leaving, the woman told them, "If you move or try anything, I'll kill the security guard."

Steele and Henshaw managed to free themselves, and Henshaw called the police.

At approximately 7:35 p.m. that evening appellant and Marlar were apprehended a few miles from the store. They were in Marlar's car. Marlar was driving and appellant was a passenger. Contraband from the robbery and instruments similar to those used to effectuate the robbery were found throughout the car. Sergeant William B. Robertson (Robertson), a Virginia Beach Police Department Investigator, arrived at the scene at approximately 7:45 p.m. and advised appellant that she was being "detained in connection with a robbery at [the store]" and advised her of her Miranda rights. Appellant stated that she understood her rights and that she wanted to make a statement. Appellant was not questioned at the time and was told that she would be questioned at the police station.

At 10:35 p.m. that evening, Officer Patrick Allen Lewis (Lewis) and Robertson interviewed appellant at the police station. Lewis told appellant that she was going to be charged with two counts of robbery, two counts of abduction, and one count of use of a firearm. Appellant acknowledged that she had been advised of her rights. Appellant confessed to committing

- 4 -

the crime with Marlar.

On August 3, 1993, nine days after the robbery, appellant's bond hearing was held.  Steele was present.  Appellant appeared at the hearing in an orange uniform, and she was shackled at the feet.  When Steele first saw appellant, she was not sure if she was the robber.  As soon as Steele heard appellant's voice, however, she knew that appellant was the person who had committed the robbery and identified her as such.

Appellant filed a motion to suppress (1) the statements appellant made to the police at the station and (2) Steele's voice identification of appellant.  A suppression hearing was held on May 3, 1994.

With respect to the interrogation, the trial court ruled that Robertson fully advised appellant of her Miranda rights, and that appellant "understood those rights and agreed to answer questions posed to her by the officers."  The trial court rejected appellant's argument that she had been coerced into making a statement, holding as follows:

> Having had the opportunity to view the
> defendant on this the videotape, to hear her
> testimony today, the testimony of the
> officers, it's clear to me that any statement
> she ultimately made was made knowingly and
> voluntarily and without any threat, without
> any duress, without any coercion on the part
> of the officers and that it was the product
> of a free mind.

With respect to the voice identification, at the suppression hearing, on cross-examination, Steele stated that she first

thought the robbery might be some kind of test by the security company and, therefore, she was paying particular attention to every detail to get as much information as she could.  Steele paid attention to appellant's voice during the robbery and felt immediately after the robbery that if she ever heard the voice again she would be able to identify it.  The trial court denied appellant's motion to suppress Steele's voice identification of appellant.

### Statement to Police

Miranda warnings "ensur[e] that a suspect knows that he may choose not to talk to law enforcement officials, to talk only with counsel present, or to discontinue talking at any time.  The Miranda warnings ensure that a waiver of these rights is knowing and intelligent . . . ."  Colorado v. Spring, 479 U.S. 564, 574 (1987).  One of the "purposes of the safeguards prescribed by Miranda [is] . . . as much as possible to free courts from the task of scrutinizing individual cases to try to determine, after the fact, whether particular confessions were voluntary."  May v. Commonwealth, 3 Va. App. 348, 354-55, 349 S.E.2d 428, 431 (1986).

Here, the trial court found, and appellant does not deny, that after being Mirandized she knowingly and voluntarily consented to make a statement to the police.  Nevertheless, appellant alleges that certain statements made by the interrogating officers at the beginning of her interview vitiated her previously given consent.  Appellant relies upon Collazo v.

Estelle, 940 F.2d 411 (9th Cir. 1991), to support her argument. Her reliance is misplaced. In Collazo, after being advised of his rights, the defendant asked to speak with a lawyer. Instead of providing him with one, the interrogating officers proceeded to discourage the defendant from exercising that right. Thereafter, after a few hours' deliberation, the defendant decided not to retain a lawyer, re-initiated contact with the officers, was again Mirandized, and confessed. Id. at 413-14. The Ninth Circuit held that it was impermissible to advise one of their constitutional rights and then discourage them from exercising them. Id. at 417. The defendant's subsequent waiver under Miranda was invalid and the court suppressed his confession. Id. at 419-20. Here, appellant did not refuse to make a statement and then agree to do so only after being encouraged not to exercise that right; rather, appellant voluntarily consented to make a statement and, thereafter, the officers made statements which she alleges were coercive. Logic dictates that appellant could not be coerced to do something that she had already agreed to do. Therefore, no constitutional error occurred.

## Voice Identification

Due process is violated if the pretrial identification procedure is "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons v. United States, 390 U.S. 377, 384 (1968). If an

identification procedure is deemed impermissibly suggestive, it must be determined "whether [the] identification[] . . . w[as] nevertheless so reliable that no substantial likelihood of misidentification existed."  Wise v. Commonwealth, 6 Va. App. 178, 184, 367 S.E.2d 197, 201 (1988) (citing Neil v. Biggers, 409 U.S. 188, 198 (1972)).  The factors to be considered in making this determination are: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.  Id. at 184-85, 367 S.E.2d at 201.

The application of these factors to this case demonstrates that no substantial likelihood of a misidentification of appellant by Steele existed.  Here, Steele had the opportunity to hear appellant speak several times during the robbery.  Steele had a heightened degree of attention during the robbery because she believed it may have been a security exercise.  Although not asked to provide a detailed description of appellant's voice prior to the identification, Steele had previously identified the voice of the robber as belonging to a woman.  Steele stated that when she heard appellant speak at the bond hearing she immediately knew appellant was the robber.  Finally, nine days passed between the time of the robbery and the identification;

this is not an impermissibly long period of time.  See Commonwealth v. Vanderlin, 580 A.2d 820 (Pa. Super. 1990) (11 days between perpetration and identification); see also Fogg v. Commonwealth, 208 Va. 541, 159 S.E.2d 616 (1968) (victim identified defendant at preliminary hearing more than two months after the crime).

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.