211 So.2d 877

**Climmie L. McCANTS**

v.

**STATE of Alabama.**

I Div. 458.

Supreme Court of Alabama.

May 13, 1968.

Rehearing Denied July 3, 1968.

Vernon Z. Crawford, Mobile, for appellant.

**398**

MacDonald Gallion, Atty. Gen., and Lloyd G. Hart, Asst. Atty. Gen., for the State.

MERRILL, Justice.

Appellant was indicted and convicted of the charge of murder in the first degree. The victim was Ola Mae Turner who died of a gunshot wound in her head. The jury fixed the punishment at death by electrocution.

Miss Ola Mae Turner operated a small fruit stand and fish market near Houston and Dublin Streets in Mobile. Her living quarters were in the rear of the building.

On August 17, 1966, around 9:00 P.M., John Shevers found Miss Turner lying behind the counter of the store in a puddle of blood. Shevers went across the street to a drugstore and asked druggist, George Morgan, for help. Morgan found Miss Turner lying behind the counter. She asked for help and complained of being sick. Morgan called the police. Officer Elwood Turner arrived and noticed several dollar bills lying on the floor as he entered the store, and saw the cash register was open. An ambulance came and Miss Turner was taken to a hospital where she died a few hours later. An autopsy was performed on her and the cause of death was determined to be a gunshot wound which entered the left ear.

Police investigation revealed that witnesses, attracted by the noise of the shot, saw two Negro men running from the store to a station wagon. Descriptions of the men and the car were secured. Detective Bell went to appellant's home seeking to locate him on the morning of August 19. He was not there, but around eleven o'clock that day, appellant called Bell and said he had heard the police were looking for him and that he was at the apartment of his sister, Shirley Hale. He offered to come to the police station but Bell told him to wait where he was. A few minutes later, Bell and five other officers went to the sister's apartment. The appellant, a twenty-three year old man, was arrested, and his constitutional rights explained to him. They questioned appellant as to the whereabouts of a pistol he had borrowed from his brother-in-law on May 16, and he told them he had left it under the seat of his automobile. A search warrant was presented to his sister and she was asked to accompany officer Simmons as he made a search. In the second bedroom searched upstairs, Simmons found a pistol, the murder weapon, under the top mattress of a bed. Before appellant was questioned at his sister's home, both appellant and his sister were handed cards on which his rights were printed and one of the officers read a card to them. Appellant was then taken to police headquarters and to jail.

Appellant's first argument is directed to the overruling of his objection to the testimony given by Captain Burch as to appel-

lant's statements made to the officers at the sister's apartment. A proper predicate was laid as to voluntariness and the ruling of the court was correct.

After appellant had been taken to jail, he was questioned that day, the 19th Saturday the 20th, Sunday the 21st, and on Monday the 22nd, appellant signed a written statement giving in detail his actions and movements on the evening of the 17th. He denied shooting Ola Mae Turner, but did make inculpatory statements which clearly made him an accessory. He said he and Robert Hughes were in his station wagon together. Hughes asked him if he had his "heat" and he told him it was on the seat. Hughest wanted him to drive to "the Fruit Store" on Houston Street. Hughes told him the lady down there sometimes slept and he was going to get some money; that he was going to get the drop on the lady. Appellant drove near the store and parked. "He was gone about three minutes when I heard a shot. When I saw him coming out of the store I walked at a fast pace toward my car and he ran to it. I asked him when he got in it if he got the money and he said yeah. I asked him what happened and he said he almost got caught and he hit the lady two or three times and the pistol went off." They drove away and Hughes got out of the car after making arrangements to meet later. Appellant found some "bills" on the seat and floor of the car after Hughes left. They amounted to $8.00. He went to various bars, shot dice and caught a bus for New Orleans at 7:00 A.M. on the 18th. The morning of the 19th, he caught a bus back to Mobile and arrived there at 9:45 A.M. He went to his sister's apartment and hid the pistol under the mattress where it was found.

The evidence is undisputed that at each interrogation appellant's rights were read to him before he was asked the first question.

Appellant testified that he signed the statement voluntarily. Before the statement was made, the appellant's mother, his sister and her husband were present at the police station and his rights were read to him, he signed a waiver and one of the witnesses to his signature was his sister. The record shows the following:

"Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in Court. You have the right to talk to a lawyer for advice before we ask you any questions, and to have him with you during questioning. You have this right to the advice and presence of a lawyer even if you cannot afford to hire one. We have no way of giving you a lawyer, but one will be appointed for you, if you wish, if and when you go to Court. If you wish to answer questions now without a lawyer present, you have the right to stop answering questions at any time. You also have the right to stop answering at any time until you talk to a lawyer.

WAIVER

"I have read ~~to~~ (written above the word to is the word 'the' in ink and the initials CLM written in ink (statement of my rights shown above. I understand what my rights are. I am willing to answer questions and make a statement. I do not want a lawyer. I understand and know what I am doing. No promises or threats have been made to me and no pressure of any kind has been used against me.

"Signed sd / Climmie L. McCants
"Witness sd / Shirley Hale
"Witness sd / Edwin A. Pennington
"Time 8:40 P.M.—8/22/66"

Appellant argues he should not have been questioned at any time at the police station because both Captain Burch and Detective Bell knew that his mother and his sister were contemplating hiring a lawyer for him.

Captain Burch testified that he asked appellant, shortly after he was booked on the 19th, if he wanted a lawyer and told him, "You should call one, I think you need one." Appellant said he would rather call his sister. Burch dialed the sister's number and left the room. On the 20th, appellant's mother told officer Pendleton that she was trying to employ an attorney; and Detective Bell testified that appellant's mother told him on the night of the 20th that she had contacted Honorable Vernon Crawford, the attorney who represented appellant in the circuit court and represents him here. He testified on cross examination:

"Q What did she tell you?

"A That she had hired you and couldn't catch up with you and she left a fee at your office with a boy you had cleaning up and she caught you coming from the office, or fixing to go back to the office, and she had talked to you. * * *"

While Captain Burch was testifying, the following occurred:

"THE COURT: Captain Burch, on the 22nd when that alleged confession was taken did you, or someone in your presence, ask him if he wanted his lawyer with him at the time before he started writing?

"A Yes, sir.

"THE COURT: You did?

"A In fact we tried to get in touch with Mr. Crawford. In fact, I talked to him a couple of times whether he was going to defend him or not. His parents were asking me if he had been up there to see him and I told them I didn't know.

"THE COURT: You mean you talked to him when?

"A Mr. Crawford?

"THE COURT: Yes.

"A I think it was on a Monday. I'm not positive about the dates but each

time we got him up to talk was when his mother and sister were coming to see him. And his mother asked me and his sister asked me if I knew whether Crawford had been down to see him and I told them I didn't know, they would have to ask Climmie that he hadn't talked to us."

This statement was neither refuted nor was Captain Burch cross examined concerning it. Burch also testified that no lawyer notified him prior to August 22nd that he represented appellant, and appellant never requested a court appointed attorney to represent him.

There is a conflict in the testimony as to whether appellant told the officers that he wanted an attorney. Appellant says he did, the officers say he did not. We copy appellant's summation of his testimony from his brief:

"The defendant testified that he called the police on August 19, 1966 after he heard they were looking for him and told them where he was, and that he would come to the police station if he was wanted; that he was taken to the police station and has been in custody every since; that he informed the police that he had had a stomach operation August 5, and that his stomach, back, and mainly his side were sore at the time of his arrest that on one occasion the police took him to the hospital; that during the interrogation he couldn't sit up erect and that he told Captain Burch he was in pain, that he was interrogated from 8 p. m. until approximately midnight on the 19th, that he was interrogated three times on the 20th by five, six or seven police officers taking turns, once in the morning, once after 12:00 and once that night; That one of the officers told him he would be released or get off with a lighter sentence if he signed a confession as an accomplice; that he was interrogated two hours in the morning from 12:00 until 5:30 and from 7:00 until 12:00 p. m. on the 22nd, the day of the

signed confession. That he made known to Captain Burch on the 19th that he wanted a lawyer to represent him that he repeated his request on the 20th saying that he wanted to know what to say during the interrogation, and that Detective Bell answered that he couldn't help the defendant if the defendant got a lawyer but that he would help the defendant if he refrained, that he signed the statement on the 22nd voluntarily and that he wasn't able to secure a lawyer until after that date."

Detective Bell denied that he made any promises to appellant or that he told him he could not help him if he wanted a lawyer.

The trial court decided this issue of fact, and the question of the voluntariness of the statement outside the presence of the jury and gave its reasons for ruling that "the confession was in all respects freely and voluntarily made after having been fully apprised of all of his rights afforded him by the constitution and by the interpretation of the Supreme Court of the United States."

Here, the twenty-three year old defendant was never questioned without first having his rights read to him, the first and last times in the presence of members of his family, and he was told, shortly after being arrested that he needed an attorney, and no oral or written statement of appellant was allowed in evidence after his arrest except those taken after he had signed a waiver of his right to have an attorney present. Members of his family were present when he signed this waiver and his sister signed as a witness. In addition, the officer in charge of the case, Captain Burch, talked with appellant's present attorney twice seeking to ascertain whether appellant was being represented by him.

■ We conclude that here the defendant made an express statement that he was willing to make a statement and did not want an attorney and this being followed immediately by a confession or an inculpatory statement, constituting a waiver; and that he voluntarily, knowingly and intelligently waived his privilege against self incrimination and his right to retained or appointed counsel.

We think the trial court correctly admitted the inculpatory statements or confession in evidence. Boulden v. State, 278 Ala. 437, 179 So.2d 20; Phillips v. State, 248 Ala. 510, 28 So.2d 542.

■ Appellant next urges error in the overruling of his motion to be allowed to inspect "any written evidence, physical evidence, scientific reports or other tangible evidence and the weapon, if any," if such evidence was to be used at the trial of the case.

The motion was properly overruled. Smith v. State, ante p. 268, 210 So.2d 826; Sanders v. State, 278 Ala. 453, 179 So.2d 35.

■ Finally, appellant argues that our statute permitting the punishment to be determined by the jury is unconstitutional because the "statute does not set up any standards by which the jury is to exercise its discretion in sentencing." The statute, Tit. 14, § 318, Code 1940, reads, in pertinent part: "Any person who is guilty of murder in the first degree, shall, on conviction, suffer death, or imprisonment in the penitentiary for life, at the discretion of the jury; * * *." Very little argument is made in brief on this point and, in answer, we merely say that we disagree and hold that this statute of over one hundred years of application is not unconstitutional because of the reason assigned in brief.

No error requiring reversal has been found in the record.

Affirmed.

LIVINGSTON, C. J., and LAWSON, SIMPSON, COLEMAN and HARWOOD, JJ., concur.