352 So.2d 460 (1976)
Johnny HARRIS, alias
v.
STATE.
1 Div. 623.
Court of Criminal Appeals of Alabama.
January 20, 1976.
Rehearing Denied March 9, 1976.
*462 William H. Allison, Jr., Louisville, Ky., W. Clinton Brown, Jr., Mobile, for appellant.
William J. Baxley, Atty. Gen., Eric A. Bowen, G. Daniel Evans, and James S. Ward, Asst. Attys. Gen., for the State.
Morris S. Dees, Jr., Joseph J. Levin, Jr., John L. Carroll, Pamela S. Horowitz, Montgomery, and Kenneth Cooper, Bay Minette, Ala., amicus curiae.
HARRIS, Judge.
Appellant was convicted of murder in the first degree and sentenced to death and the execution date was set for April 18, 1975, but was suspended pending an automatic appeal to this Court.
Omitting the formal parts, the indictment reads as follows:
"The Grand Jury of said County charge that before the finding of this indictment Johnny Harris, alias John Harris, whose true name is to the Grand Jury otherwise unknown, a convict, having been sentenced to imprisonment in the penitentiary of the State of Alabama for the term of his natural life, by the Circuit Court of Jefferson County, Alabama, while such sentence remained in full force against him, and while he was serving under said life sentence did commit murder in the first degree in this; that the said Johnny Harris, alias John Harris, did unlawfully and with malice aforethought kill Luell Wheeler Barrow by stabbing or cutting him with a knife or a knife-like instrument, a further description of which being otherwise unknown to the Grand Jury; against the peace and dignity of The State of Alabama."
Appellant was serving five life sentences at the time the above indictment was returned by the grand jury of Escambia County.
Title 14, Section 319, Code of Alabama 1940, provides as follows:
"Any convict sentenced to imprisonment for life, who commits murder in the first degree, while such sentence remains in force against him, shall, on conviction, suffer death."
The above-quoted statute has been in force and effect in Alabama for over a century. The highest Court of this state has held that this statute is not offensive to the Constitution as class legislation.
In Bailey v. State, 211 Ala. 667, 101 So. 546, the Supreme Court said:
"It is provided by the statute that any convict sentenced to imprisonment for life, `who commits murder in the first degree while such sentence remains in force against him, must, on conviction, suffer death.' Code 1907, § 7089. This statute is not offensive to any clause of the state or federal Constitutions. The statute cannot be held offensive to organic law as class legislation. Williams v. State, 130 Ala. 31, 30 So. 336; Singleton v. State, 71 Miss. 782, 16 So. 295, 42 Am.St.Rep. 488; Brown v. State, 50 Tex.Cr.R. 114, 95 S.W. 1039; People v. Hong Ah Duck, 61 Cal. 387; People v. Majors, 65 Cal. 138, 3 P. 597, 52 Am.Rep. 295; State v. Connell, 49 Mo. 282; Kennedy v. Howard, 74 Ind. 87. It is not ex post facto. 24 L.R.A. (N.S.) 433, note. It does not impose cruel and unusual punishment, nor does it inflict double punishment or put the accused twice in jeopardy. Borck v. State (Ala.Sup.), 39 So. 580; Underhill on Crim.Ev. (2d Ed.) pp. 819, 820, §§ 506, 507."
Mr. Justice Gray, speaking for the Supreme Court of the United States, says of such statutes:
"`It is within the discretion of the Legislature of the state to treat former imprisonment in another state as having the like effect as imprisonment in Massachusetts, to show that the man is an habitual *463 criminal. The allegation of previous convictions is not a distinct charge of crimes, but is necessary to bring the case within the statute, and goes to the punishment only. The statute, imposing a punishment on none but future crimes, is not ex post facto. It affects alike all persons similarly situated, and therefore does not deprive anyone of the equal protection of the laws. Moore v. Missouri, 159 U.S. 673, 16 S.Ct. 179, 40 L.Ed. 301.' McDonald v. Commonwealth of Mass., 180 U.S. 311, 313, 21 S.Ct. 389, 390, 45 L.Ed. 542, 547."
In Williams v. State, 239 Ala. 296, 195 So. 213, the Court held:
"A life convict could suffer no punishment for first degree murder committed while such convict is serving such sentence if he were merely sentenced for life for that offense. Hence, this statute.

* * * * * *
"It is further insisted this charge of being a life convict at the time when he is accused of murder in the first degree should not appear in the indictment to go to the jury, nor evidence in support thereof presented to the jury because of bias or prejudice aroused in the minds of the jury. It is suggested this matter should be brought to the attention of the court alone, and if found to be true, the jury be instructed to inflict the death penalty if found guilty of murder in the first degree. This suggestion should be addressed to the Legislature rather than the courts.
The burden is on the state to aver and prove the facts which bring the case within Section 4459, supra. The defendant is entitled to controvert them. For example he may show he was no longer a convict because of a previous pardon, or may question his identity with the person sentenced to life imprisonment.
That the facts in this regard should appear in the indictment, and the evidence of same submitted to the jury along with the other evidence is settled by our former decisions. Williams v. State, 130 Ala. 31, 30 So. 336; Johnson v. State, 183 Ala. 79, 63 So. 163; Bailey v. State, 211 Ala. 667, 101 So. 546."
In Williams v. State, 130 Ala. 31, 30 So. 336, in construing this same statute said: "Objections were taken to the second count of the indictment by demurrer and motion, directed mainly to the averment: `Who was then and there a convict sentenced to imprisonment for life for murder in the first degree in the criminal court of Jefferson county, to wit, the 18th day of March, 1899, and while said sentence was yet in force against him,' etc. The count is in conformity to the requirements of section 4859 of the Code, which provides that `any convict sentenced to imprisonment for life, who commits murder in the first degree while such sentence remains in force against him, must, on conviction, suffer death.'
Nor is there any merit in the objection to the count involving the constitutionality of the section above quoted on account of its being class legislation. The punishment imposed by the statute is the only one that could be effectually inflicted. Any less degree of punishment would amount to no punishment at all. This is sufficient to maintain and justify the classification made by the statute. It is clear that the statute applies alike to all convicts, while under sentence to imprisonment for life, who commit murder in the first degree, whether the imprisonment is the result of a conviction for murder in the first degree or any other offense punished by imprisonment for life."
Of course these cases were decided before Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346. More will be said later in this opinion in the light of the Furman decision.
We turn now to a consideration of the evidence in this case.
On January 18, 1974, a riot broke out in the segregation unit at Atmore Prison. The unit contained approximately sixty-four inmates. All of the inmates were freed from their cells after Johnny Harris, *464 appellant, and inmate Oscar Johnson, overpowered the two guards in charge of feeding the evening meals. One of the guards was subsequently killed and the other seriously injured by the prisoners during their self-styled revolution. Appellant was one of five inmates charged with the murder of Prison Guard Luell Wheeler Barrow.
Warden Marion B. Harding testified that he was the Warden at Atmore Prison at the time the riot broke out. He stated he had been out looking for escaped prisoners on the afternoon of January 18, 1974, when he received word that a riot had begun in the segregation unit of the prison. He returned to the prison immediately and gave instructions to the prison officers as to what measures to take to subdue the rioting prisoners. The inmates had taken two guards hostage. Harding went down the hallway and stopped at a window to the unit. The window was blocked with cardboard, and he called for an inmate named George Dobbins. Dobbins came to the window and removed the cardboard to talk with Harding. Harding stated that at this time he could see into some parts of the segregation unit. Dobbins told the Warden that they were having a revolution, and that they were "going to kill some pigs today." On this first view the Warden stated that he saw inmates Frank Moore, Oscar Johnson and George Dobbins with knives, and that inmate Lincoln Heard had a club. At this time the Warden did not see appellant or the two captured guards. Harding said the inmates were talking loudly, and he asked them to be quiet so that he could talk to Oscar Johnson and George Dobbins. At this time inmate Lincoln Heard spoke and said:
"Listen we are all in this thing together and if you talk to one of us you talk to all of us, all of us are involved in this___________ Revolution."
Dobbins informed the Warden that they wanted to talk to the Governor and other named individuals and gave him five minutes to produce them. The Warden told him that it was impossible to get these people in five minutes, and Dobbins stated that he knew this. Dobbins said they had already killed some inmates. Two inmates were dragged to the window on blankets, and, in the view of the Warden, appeared to be dead.
The Warden further testified that a guard, Arthur Dreadin, was brought up within view of the window and that appellant was beside him. He did not see a weapon in appellant's hands; he could not see appellant's hands at all. The window was then closed so that the Warden could not see into the unit. The inmates started taking Dreadin away, and the Warden went to another window in a door that looks into the lobby of the segregation unit. From this vantage point the Warden stated he saw Officer Dreadin sitting on a food cart with several inmates around the cart; that he saw appellant behind the cart and that appellant had a weapon.
During all of this time the Warden had not seen Officer Barrow. He sent for a key to open the back door to the unit. When he entered the opened door, the only person he saw was George Dobbins. The Warden tried to reason with him, but someone yelled and said to get the revolution on. The voice came from back in the cellblock, and Dobbins replied, "Bring me one of them ______ ______ pigs." At this time Officer Dreadin called out saying, "Come on in and get me; they have killed one of us and are killing me now." At this point the Warden ordered his men to go in. Upon entering the cell, he saw Frank Moore and George Dobbins stab Officer Dreadin. When the officers entered the lobby, they were met with a hail of commode parts and aerosol cans being thrown by the inmates. In order to bring matters under control, the Warden ordered those guards with shotguns to shoot into the floor. When the shots were fired, the inmates scattered and went into the cells. Officer Barrow was found on the floor in Cell One with his feet bound and hands tied behind him. He had been stabbed twenty-seven times and had been struck on the head. The cell in which Officer Barrow was found had been occupied by appellant and Oscar Johnson prior *465 to the riot. George Dobbins went into the Number One Cell where Barrow was found. Appellant was seen just outside Cell One but went into Cell Two when the guards entered the lobby. The Warden identified State's Exhibit Number 22 as being the knife that Oscar Johnson had in his possession on January 18, 1974. He stated that eleven or twelve knives were picked up in the segregation unit, Side Two, on that date.
On cross-examination the Warden was shown a copy of a statement he had given to state investigators concerning the riot. He acknowledged that appellant's name was not mentioned in the statement. In his statement he said he was unable to identify all inmates around Officer Dreadin when he was seated on the food cart, but did identify Dobbins and Oscar Johnson. Trial counsel offered excerpts of the Warden's testimony in the trial of codefendant Oscar Johnson to the effect that the Warden again failed to mention appellant as one of the inmates around Officer Dreadin near the food cart. The prosecution used the same testimony in the Johnson case to show the Warden identified appellant as being one of the inmates who brought Officer Dreadin to the window of the segregation unit where he was viewed by Warden Harding.
Jewel Philmore Thomas testified that he was an inmate at Atmore Prison on January 18, 1974, and was in the segregation unit when the incident took place. He was in Number One Cell on one side. On the afternoon of the 18th he saw an inmate flash a knife and someone hollered, "This is a revolution, do you want your door opened?" An inmate asked him if he was with the revolution or against it, and he replied that he was "neutral." George Dobbins had a knife and stabbed Thomas and then left the cell. Thomas was called by someone. He asked appellant who called him as appellant was right outside his cell. Thomas then went to Cell Fifteen on orders from Dobbins, and Dobbins asked him if he was with them or against them and he inquired, "in what?". Dobbins said, "in killing the two guards," and Thomas said, "no." Dobbins accused him of being a snitch and called for "five good brothers." Thomas testified that appellant was one that responded to the call and came to his cell. He further testified that they all began to stab him and that he did not notice anyone in the cell who did not have a knife. He said he was stabbed twenty-two times.
John Boykin was called as a witness for the State and testified that he was in the segregation unit on Side One in Cell Eleven on January 18, 1974. That afternoon he heard someone holler, "this is a revolution." He heard Dobbins say, "We're going to kill all the house niggers, and all that ain't going to participate." Boykin said he was not going to participate and Dobbins replied he would have to kill him. Dobbins called for appellant to open Boykin's cell, and appellant opened the door to the cell. Inmates came in Boykin's cell and hit and stabbed him. Boykin stated that he was stabbed twenty-one times. Appellant was not in his cell. Boykin further testified that he had heard the revolutionaries giving speeches and had heard appellant's speech among them ten days before the riot.
Prison Guard Arthur Dreadin testified that he was working in the segregation unit with Officer Barrow on January 18, 1974. He stated they were feeding the inmates on Side Two of the segregation unit and that appellant and Oscar Johnson were picking up the trays from those who had finished eating. They proceeded to bring the trays to the lobby of the unit. Appellant came out with an armload of trays and pushed Officer Barrow. Appellant then dropped the trays and displayed a 14 inch pick. Dreadin testified that appellant told him not to say a word and held the pick on him while Oscar Johnson placed a knife against Officer Barrow's neck. Dreadin further testified that State's Exhibit 25 looked like the pick that appellant drew on him. He stated that appellant and Johnson then took the guards' keys, money and watches. The guards were carried to Number One Cell on Side Two of the segregation unit. Appellant and Johnson then released all the inmates from their cells. Dreadin stated that *466 appellant said, "We are going to kill some pigs today."
Once they had released the other inmates, appellant, Oscar Johnson and some others took the guards to the lobby and tied their hands behind them. Appellant was standing beside Officer Dreadin with a club. Dreadin and Barrow were carried to the window, and two injured inmates were dragged to the lobby. Appellant and Johnson then took the guards back to Cell One. Several inmates were in the cell including appellant. Dreadin further testified that appellant, Johnson, Lincoln Heard, Grover McCorvey, Frank Moore, himself and Officer Barrow were in this cell and that Frank Moore was hitting him with a knife. Someone hit Officer Barrow and he made an awful groan. Dreadin stated that he made a break and called for the Warden to come in. Dreadin said that practically all the inmates had weapons.
Prior to cross-examination the prosecution told defense counsel that Dreadin had been interviewed by the State twice, once in February and once in March. In his written statement, Dreadin did not say that appellant was in the cell when Officer Barrow was stabbed. However, appellant's name was mentioned as one who carried Officer Barrow to the lobby door, and he was named in the statement made by Officer Dreadin on February 15, 1974. On re-direct, Officer Dreadin said that appellant told him, "I'm going to kill you; I'm going to roll your head down the hall with the rest of these pigs."
Mrs. Leona Barrow was called as a State's witness and testified that she was the widow of Luell Barrow. Appellant objected to her testimony and offered to stipulate to the identity of the deceased guard. The objection was overruled and she testified that her husband died on January 18, 1974, and that he had worked at Atmore Prison Farms.
A stipulation was agreed to by counsel concerning the autopsy performed on Officer Barrow. There were twenty-seven stab wounds on his body in addition to a large contusion and bruises. The cause of death was a deep wound which penetrated fourteen inches and passed through the liver, the left lung and diaphragm, and cut the heart in two.
Appellant was interrogated by Mr. W. L. Bullard, an investigator for the State Board of Corrections. He signed a waiver of rights form prior to being interviewed. He voluntarily signed a statement which was received in evidence without objections. The statement is as follows:
"I, Johnny Harris, make the following statement to W. L. Bullard, who has identified himself as an investigator the State Board of Corrections. I have been advised of my rights and I understand my rights. I have signed a Waiver of my rights. I do not want a lawyer at this time. I understand that I am to be interviewed regarding the incident occurring on Friday, January 18, 1974 in Segregation One and Two here at Atmore Prison.
I am an inmate assigned to Atmore Prison. I am serving a life sentence for rape and four life sentences for robbery. I was sentenced from Jefferson County. My birth date is August 14, 1945. I have finished the ninth grade at Dunbar High School in Bessemer, Alabama.
On Friday, January 18, 1974, Oscar Johnson made me open the cell doors on two side in the Segregation Unit. After he, Oscar, took Officer Barrow and Dreadin hostage. Oscar Johnson used a knife to take the officers hostage and to make me open the doors. Oscar told me which cells to roll first. He told me to roll, that's open, Cell fifteen (15) first. That was the cell that George Dobbins was in. He told me to open cell number nine next. That's the Cell Charles Kelley and Burl Moore was in. He told me to open number four (4) where Brother Frank X. Moore and Charles Beasley was next. He told me to open number five Cell where Grover McCorvey was next. Then he told me to open three (3) cell where Lincoln Heard and Joe Broughton was. I don't remember how he told me to open the rest of the doors, but I rolled all of them on both sides. That's all I had to do with the thing `cause that's all they made me do. *467 I heard George Dobbins and Lincoln Heard and Oscar Johnson talking to the officer and Warden in the hall. I saw Frank Moore and Oscar Johnson and Lincoln Heard tie up the officers they took hostage. I saw Oscar Johnson put a knife in Officer Barrow's mouth. I saw Charles Beasley with a club during the incident. George Dobbins, Oscar Johnson and Frank Moore I saw with knives. I saw Lincoln Heard with a pick when he come out of two side and George Dobbins told Heard to stay with me. Lincoln Heard still had the pick the last time I saw him in one cell when he was sticking Officer Barrow. I saw Benjamin McDade with a piece of bed rail and I saw somebody else. I don't know who, with an iron pipe. I don't know how long the pipe was.
Just before Mr. Harding and them come in I saw Brother Frank Moore stab Officer Dreadin in the stomach and one time in the back. He struck Officer Dreadin in the stomach one time in one cell door and one time in the back when he was taking Officer Dreadin to the grill door to George Dobbins. I was standing in the door of two cell when I saw this. While I was still standing in the door of two cell I saw Lincoln Heard and Oscar Johnson stabbing Officer Barrow in one cell. They wasn't quite half way back in the cell when I saw this. I didn't see any other convicts in one cell at this time.
When the Warden and them come in the lobby door, I went on back in two cell. I was in two cell by myself all the time then until the Warden and them got to my cell two cell. I heard two shots, I believe they was shotgun shots. Right after the shots is when the Warden and a guard come to my cell, that's two cell, and told me to come out with my hands on my head. I come out of two cell and went up the hall.
About the time I got even with the shower room I was hit with a club. I was hit from behind. I didn't see who hit me because I was hit from behind. The lick knocked me down on my hands and knees and I crawled the rest of the way through the lobby and out into the main hall. I was hit several times while I was knocked down in there at the shower, but I didn't see who hit me because I eas (sic) regular trying to get out of the hall through the lobby to where they told me to go. When I got in the main hall, I wasn't hit at all. They told me to get over there with the rest of them with my face down and I did. After they got everybody else out they had us pull our clothes off. They told us to get down on my hands and knees in line and go to the visiting room.
I did what they told me to and when I got in the visiting room they stitched up my head and sent me to Atmore to the hospital for x-rays. They sent me to the prison hospital first and then to Atmore to get x-rayed.
I had been advised that I do not have to answer the following questions unless I want to. I know that I do not have to answer any one of these questions or any questions at all unless I want to.
Q. 1. Did you see any one get shot on Friday, January 18, 1974, in Seg one and two?
A. No sir.
Q. 2. Can you pick out or otherwise identify the officer or officers that hit you during the incident occurring on Friday, January 18, 1974, in Seg. one and two?
A. No sir.
Q. 3. What days were meetings held in Seg. one and two by the Revolutionaries?
A. Monday, Wednesday, Fridays and Sundays, I believe.
Q. 4. Are you a Revolutionary?
A. No sir.
Q. 5. Did you hear any talk from the other convicts in Seg. one and two about revolution during the time you were in Segregation?
A. Yes sir.
Q. 6. Who were the leaders or main speakers?
A. The main speakers was George Dobbins, Lincoln Heard, Oscar Johnson, Frank Moore and Charles Kelley. At one time or another everybody have spoke.
*468 Q. 7. Who were the officers in the Revolution Movement?
A. Chairman was George Dobbins and the co-Chairman was Charles Kelley, Secretary was Oscar Johnson and the Treasurer was Frank Moore and the Sgt of Arms was Johnny Wilson.
Q. 8. Did you stab anybody, officer or inmate, during the incident that occurd (sic) on Friday, January 18, 1974, in Seg. one and Two?
A. No sir.
I have read and signed each page of this five page handwritten statement and have initialed each change. I have answered each question as written. This statement is the truth to the best of my knowledge.
Johnny Harris /s/
February 5, 1974
Time: 5:20 P.M.
Witness:
W. L. Bullard."
During his trial appellant testified at length. His testimony, in the main, substantially followed his signed statement. In sum, he contends that he was an unwilling actor during the entire riot and that he released all the convicts from their cells because he was told that if he failed to do so "they were going to deal with him." In short he was forced to do what he did for fear of his life.
Following the indictment in this case on April 2, 1974, appellant's counsel filed numerous pretrial motions including a motion for change of venue. On May 20, 1974, appellant filed a motion to obtain statements and other information. This motion was amended several times, and, in substance, sought all statements that contain exculpatory information, files of an organization known as Inmates for Action, and requested that defense counsel be allowed to inventory and examine all physical evidence and weapons in possession of the State which were connected with the prison riot. Initially, the motion requested statements that contained exculpatory information or information that would lead to exculpatory information. On May 21, 1974, appellant amended this motion by striking the words "or information that will lead to exculpatory information." The amended motion was to obtain all exculpatory statements that would be beneficial in the defense of appellant.
On May 27, 1974, appellant filed a motion for funds to hire a special investigator to aid in preparation of his defense. In this motion he alleged that numerous witnesses, codefendants and prison guards were present at the time of the incident and that many of these people were now scattered throughout the state. In support of this motion he contended that the State's numerous investigators, and his limited ability as an investigator would deprive the defendant of his constitutional rights unless he was furnished state funds to hire an investigator. He estimated that $2,000 to $6,000 would be required to employ such an investigator.
On May 31, 1974, he amended his motion to obtain statements and other information, and filed a motion to quash the indictment. In his amended motion to obtain statements he requested all reports made by the officers at Atmore Prison, the Board of Corrections, the Department of Public Safety or any other State agency which refer to the January 18, 1974, riot at Atmore. In his motion to quash the indictment he alleged that the indictment lacked specificity, that the punishment that could be imposed was cruel and unusual and in violation of Furman v. Georgia. He further alleged that the State statute giving rise to this prosecution (Title 14, Section 319, 1940 Code of Alabama) imposed an arbitrary and irrational classification denying the defendant equal protection of the law and further that the indictment informs the jury of a prior criminal conviction prejudicing the rights of the defendant to a fair trial.
A hearing was held on these motions on July 15, 1974. Following this hearing the Circuit Judge of Escambia County issued a written order on July 23, 1974, in connection with the motion to quash, motion to obtain statements, and motion for funds to hire a special investigator. All grounds set *469 forth in the motion to quash the indictment were overruled. The Court at the request of appellant's counsel agreed to an "in camera" review of all statements made to State investigators and to turn over to defense counsel all statements found to be exculpatory in appellant's case. After an "in camera" view of all statements, the Court provided appellant's counsel with all statements of an exculpatory nature.
The trial of this case involved a great deal of preparation on the part of all concerned. The State of Alabama recognized the great importance of this case and its duty to appellant and agreed to submit all written statements taken by the investigators growing out of the January 18, 1974, riot to Judge Webb for his in camera inspection and review. He reviewed these statements in camera in a procedure as suggested by Palermo v. United States, 360 U.S. 343, 79 S.Ct. 1217, 3 L.Ed.2d 1287, and Cooks v. State, 50 Ala.App. 49, 276 So.2d 634.
Judge Webb reviewed over sixty statements taken by the investigators of the Board of Corrections having nothing to do with appellant or his case. At the conclusion of his in camera inspection Judge Webb forwarded eighteen statements to defense counsel. Although provided with eighteen witnesses to the riot incident, appellant's counsel chose not to use any of them.
An evidentiary hearing was held on appellant's motion for a change of venue. At the conclusion of the hearing the Court granted the motion for change of venue and the trial was moved from Escambia County to Baldwin County.
After the case was removed to Baldwin County, appellant amended his motion to quash the indictment alleging for the first time that women and blacks were systematically excluded from the jury rolls of Escambia County from which the grand jury was selected.
Appellant alleged in his motion to quash the indictment that blacks and women were under-represented on the Escambia County jury roll. He alleged that only 10.6% of the people on the jury roll from which the Escambia County grant jury was selected were black while blacks constitute 27.2% of the population of Escambia County eligible for jury duty. He contended that approximately 35.5% of the names from which the grand jury was selected were names of women while women constitute 50% of the population of Escambia County eligible for jury duty. Appellant informed the Court that in order to get an accurate representation of the composition of the Escambia County jury roll, his statistical expert, Dr. Joseph Van Matre, directed that a random sample of 451 names be taken from the jury roll. An affidavit of defense counsel's assistant shows that she took a sample that consisted of the last 451 names on the jury roll. Dr. Matre's affidavit established that the ratio of blacks on the jury roll could vary between 7.0% and 14.2%. Appellant contends that the Escambia County jury roll consisted of 4,000 names, and that the random sample of 451 names showed an under representation of blacks by 61% and females by 29%.
When the motion to quash the indictment was filed in the Circuit Court of Baldwin County, Judge Telfair J. Mashburn made an order on December 4, 1974, setting the motion for an evidentiary hearing on December 18, 1974, for appellant to "present facts in support of said motion."
This time span of two weeks gave appellant ample time to subpoena the members of the Jury Commission of Escambia County, and the Clerk of the Commission, as well as other witnesses, to prove the allegations of his motion to quash the indictment.
On December 18, 1974, appellant's counsel presented no witnesses in support of said motion and the same was denied.
Shortly thereafter appellant filed a motion to recuse Judge Mashburn on the grounds of bias and prejudice. A hearing was held on the motion to recuse on January 15, 1975, and the motion was denied.
Thereafter a petition for a writ of mandamus was filed in this Court. After a hearing this Court granted the writ requiring *470 Judge Mashburn to recuse himself from presiding over appellant's trial.
Honorable Leigh M. Clark, Supernumerary Circuit Judge from Birmingham, was assigned to conduct appellant's trial. The record affirmatively shows that appellant never again requested that his motion to quash the indictment returned against him by the Escambia County grand jury be reconsidered. He, therefore, knowingly and effectively abandoned the motion to quash the indictment.
On February 7, 1975, appellant filed his third motion for a continuance and amended it on February 11, 1975. A hearing on the motion, as amended, was held on February 13, 1975, and the same was denied without prejudice to its later presentation on the date of the trial which was set for February 24, 1975. Counsel for appellant stated to the Court that any motions he would have at that time could be taken care of within an hour or two.
Appellant was arraigned on February 17, 1975, and pleaded not guilty to the indictment. On the day of the trial, counsel for appellant filed, in open court, a motion to quash the petit jury venire in which he alleged systematic exclusion of blacks and women from the jury rolls from which the trial venire was drawn. Appellant offered absolutely no testimony in support of this motion though the opportunity to do so was afforded him by Judge Clark. Defendants having failed to offer any evidence in support of this motion, Judge Clark overruled the motion. Appellant orally moved the Court that no questions be asked the jurors concerning their views on capital punishment. The Court overruled the motion, and the case proceeded to trial.
In Butler v. State, 285 Ala. 387, 232 So.2d 631, the Supreme Court held:
"The burden of proof is on the person attacking selection procedure to show `the existence of purposeful discrimination' by the exclusion of Negroes on account of race from jury participation. Whitus v. State of Georgia., 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599, Fay v. People of State of New York., 332 U.S. 261, 285, 67 S.Ct. 1613, 1626, 91 L.Ed. 2043. Purposeful discrimination may not be assumed or merely asserted. It must be proved."
The same rule applies to purposeful discrimination by reason of sex.
In Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759, Mr. Justice White writing for the majority said:
"`Venires drawn from the jury box made up in this manner unquestionably contained a smaller proportion of the Negro community than of the white community. But a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his race on the jury which tries him nor on the venire or jury roll from which petit jurors are drawn.
* * *'"
The Fifth Circuit has held that it is insufficient for purposes of showing systematic exclusion if only the sex and race of the jury venire drawn for the trial of the case is shown without any showing as to the racial and sexual makeup of the entire jury list. Jackson v. Morrow, 404 F.2d 903. Jackson held that merely showing that the venire of 39 persons, summoned from the jury box of 6,000 names for the entire federal court district, had 36 whites and 3 Negroes, and of this number 37 were men and 2 were women, together with proof as to the gross composition of the population of the district with respect to race and sex, was insufficient without a showing as to the racial or sexual composition of the entire jury box to establish that the box failed to attain a fair cross section of the community.
Since the motion here showed only the sexual and racial composition of the entire county and of the jury venire drawn for the trial, and did not show the racial and sexual makeup of the master jury list, the motion was insufficient and could be dismissed without a hearing on authority of Jackson v. Morrow, supra.
The Fifth Circuit Court of Appeals of the United States again recognized this principle in Singleton v. Estelle, 492 F.2d 671. This case clearly deals with appellant's motion *471 to quash the petit jury venire and unequivocally holds that when the motion shows only statistics of the racial and sexual makeup of the county and the jury venire for the trial, a prima facie case is not made out.
As stated in Singleton v. Estelle, supra, "The threshold requirement for establishment of a prima facie case of racial discrimination in jury selection is a showing of marked disparity between the percentage of Negroes among persons putatively qualified to serve as jurors and the percentage of Negroes actually on the jury lists in the case in question. . . ." (citing cases).
A footnote following the above-quoted language emphasized that proof merely of lack of Negroes or under-representation of Negroes on petit juries, as appellant alleges, is insufficient to establish a prima facie case.
In this case only one jury venire is shown and no comparison is made between the percentage of Negroes on this list and the master jury list of Baldwin County.
It is clear from the record in this case that appellant was given the opportunity to be heard on his motion to quash the petit jury and waived his opportunity for such hearing by stating he would rest on his motion. The opportunity for a hearing was extended to appellant and he refused it.
We therefore find that appellant failed to meet the burden cast on him to establish discrimination on his motion to quash the indictment or the petit jury venire. Butler v. State, supra.
When qualifying questions were posed to the members of the jury venire concerning their views about the death penalty, three members voiced their opposition to capital punishment. The Attorney General challenged them for cause. The trial judge reserved a ruling on the challenges until the entire jury panel was qualified. The three jurors who stated they were opposed to the death penalty were then separately examined at length by both the Attorney General and the trial judge.
A voir dire hearing on the qualification of the three challenged jurors was had in chambers and out of the presence and hearing of the entire venire panel which had been duly qualified. We will set forth the questions and answers of these three jurors.
"Mrs. Ingersoll: I am against it.
"Mr. Baxley: You are against capital punishment, PERIOD?
"Mrs. Ingersoll: Yes sir.
"Mr. Baxley: Would your opposition be such that you could not, with good conscience vote for the electric chair regardless of what evidence came from the stand?
"Mrs. Ingersoll: Yes.
"Mr. Baxley: In other words, it could very well be that your opposition could be such that it would affect your vote on guilt or innocence of the person that you tried?
"Mrs. Ingersoll: Yes."
The Court did not sustain the challenge at that time but Judge Clark examined her further:
"Q. Mrs. Ingersoll, these questions are asked with no intention at all of causing you any embarrassment at all, and you are absolutely free to answer them without any concern about the result of it. You certainly will not be affected by that. You expressed some reservations about the death penalty or capital punishment?
"A. Yes.
"Q. Would those reservations prevent you from deciding this case according to the evidence and according to the law?
"A. In a way it would, because it would bear on my conscience; if he was convicted it would bear on my conscience that I had something to do with it, if he was put to the electric chair or something "Q. I will ask you these specific questions: Whether your attitude about the matter of the death penalty, would that prevent you from making an impartial decision as to the defendant's guilt?
"A. I believe it would."
The conversations with Mr. Walton appear as follows:

*472 "Mr. Baxley: Mr. Walton, you indicated that you are opposed to capital punishment. Would your opposition be such that it could very well affect your vote as to guilt or innocence in a case?
"Mr. Walton: I just don't believe in passing judgment on a man.
"Mr. Baxley: So your opposition to the death penalty would be such that you feel that it could be affected that it could affect your verdict as to guilty or innocent where you only had two options?
"Mr. Walton: Yes sir."
Again Judge Clark did not grant a challenge but examined Mr. Walton further:
"Q. Mr. Walton, you expressed yesterday some reservations about the matter of capital punishment or the death penalty. Is that right?
"A. That is right.
"Q. We are not intending to embarass (sic) you, but you are free to answer these questions without any concern about the hereafter insofar as you are concerned. Would your reservations about capital punishment preclude you or prevent you from making an impartial decision as to the defendant's guilt?
"A. You are speaking about the defendant here?
"Q. That is right Would your views about it prevent you from making an impartial decision in this case as to the defendant's guilt We come to the matter of his guilt first?
"Mr. Dees: We object to any questions regarding this case and this defendant.
"The Court: Would it prevent you from rendering an impartial decision in a case?
"A. Prevent me from making a decision in this particular case?
"Q. I am asking you if you would be unable to subordinate your own personal views as to capital punishment?
"A. Right.
"Q. You would be unable to subordinate those views?
"A. Right.
"Q. And that you could not or would not render a verdict in the case that would involve capital punishment, or could involve capital punishment even though that is the law of the State?
"A. Yes sir.
"Q. You could not do it?
"A. No sir."
Appellant, likewise, contends that the Court's exclusion of Mrs. Boone was in error and requires reversal. It must be noted, at the outset, that Judge Clark's voir dire of Mrs. Boone was rather lengthy. He was obviously being very careful to determine her true feelings, regarding the death sentence, without confusing or offending her on that issue. A more meticulously conducted Witherspoon examination could not have been performed. The examinations of Mrs. Boone were conducted by both Mr. Baxley and Judge Clark and appear in substance as follows:
"Mr. Baxley: Now, Mrs. Boone, would you be so opposed to capital punishment that you could not vote to return a verdict that resulted in the death penalty, regardless of how strong the evidence was?
"Mrs. Boone: Well, since I have never been faced with that before, I could not say definitely `yes' or `no', so I could not really answer.
"Mr. Baxley: Let me ask you this, Mrs. Boone, Do you think your opposition to it would be such that it might affect your verdict as to guilt or innocence?
"Mrs. Boone: No.
"Mr. Baxley: If you knew
"Mrs. Boone: No if I knew undoubtedly
"Mr. Baxley: If you knew beyond a reasonable doubt if you knew by saying `guilty' that the only punishment to be handed down, or the only verdict would be the electric chair, would that affect your verdict as to guilt or innocence?
"Mrs. Boone: I still can't change how I believe about something like thatNo.
"Mr. Baxley: You think you believe so strong about it that it would influence whether you voted guilty or not?
"Mrs. Boone: It might, because I don't know that much about what goes on in a *473 trialif they could get the electric chair, yes it would, but to turn him loose, no. I could not say `not guilty' and let him go loose on the streets but if it could be a lesser charge, I could change my mind No, not the elect (sic) chair; I could not voteWell, that is hard to explainI don't believe in capital punishmentPERIODI just don't believe in it at all, but since you don't know an awful lot about court procedure and charges, but I could not vote that a person just be turned loose that has killed and killed and killedI think that person should be locked up.
"Mr. Baxley: If a man was under a life sentence and he would still be under a life sentence regardless of the verdict if you voted guilty he would still be under the sentence, it might affect your verdict, because you would be opposed to the electric chair?
"Mrs. Boone: Right."
Even though Mrs. Boone specifically said she would not give the death sentence, Judge Clark chose to examine her further:
"Q. Mrs. Boone, you expressed some reservations yesterday with reference to the matter of the death penalty on capital punishment. I want to ask you, please mam, and please feel free to express yourself on it, and there will be no reflection upon you whatever in the way whatever you say in that respect. I am asking you if such reservations would prevent you from rendering a verdict in this case in accordance with the law and the evidence?
"A. Well it doesn't make any difference how you look at it, or how it is reworded, or how you change it, I still can not honestly say with a free conscience believe in capital punishment; I could not change my mind any way you look at it.
"Q. You do not believe in capital punishment, and as I understand you, you have very firm opinion about that?
"A. Yes sir.
"Q. I am asking you whether or not your views in that respect would prevent you from making an impartial decision in this case as to the issues and that is as to the defendant's guilt in this case?
"A. Well, so far as being guilty is concerned, no. If I feel like definitely the person is guilty, I would say so.
"Q. Would the fact that his being guilty, if he is guilty, and the fact you would find him guilty, would the fact that you understand that he would be given the death penalty if he was guilty, would that prevent you from rendering a verdict of guilty?
"A. I still with a free conscience, could not sayWell, it's kinder hardI still do not believe in capital punishment. I don't think that person should be turned looseNo, I still don't believe in capital punishment. If I knew he was going to be sent to prison and kept there the rest of his life, that is what I would expect, but I still don't believe in capital punishment.
"Q. It is understood that you do not believe in capital punishment?
"A. Right.
"Q. I will ask you if you could subordinate your views so as to abide by your oath as a juror, which the oath of a juror is, to try a case and true verdict render according to the evidence, so help you God, and obey the law of the State, if the law in the State said under certain circumstance a person, if he is guilty, his punishment should be death. How would you comply with that law of the State?
"A. _ _ _
"Q. There is no reflection on you _ _
"A. No, but I am tossing that in my mind; in other words, it would be up to me to decide whether or not he was guilty or me having something to do with the decision whether or not he was guilty, and it would be up to the law, and I would have no hand in that _ _ _
"Q. I am asking you if the law in that event you were to also say his punishment would be death, would you comply with that law?
"A. No.
"Q. You just would not do it? *474 "A. No. - - - I know nothing is perfect, like the law is not perfect, and there has to be - - - there always has to be something done, and it is done the best way possible, but that is just one way I think is very imperfect about the law.
"Q. You would go by your conscience rather than the law?
"A. I am afraid I would have to.
"Q. You are saying you would not do it?
"A. Right."
We find no error on the part of the trial judge in sustaining the State's challenge to the above three jurors and cite Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776; Seibold v. State, 287 Ala. 549, 253 So.2d 302.
Appellant claims he was denied a fair trial when he was not given access to the tape recording or a transcript of that recording of an interview with Guard Arthur Dreadin prior to trial. Judge Webb turned over to the defense a statement of Mr. Dreadin made on February 15, 1974. Subsequent to that date the State had recorded an interview between Dreadin and Mr. Tom Young, a prosecutor at the trial. A transcription of this tape interview was first offered to the defense during the trial. Defense counsel had previously interviewed and taken a statement from this witness which proved to be inconsistent with certain parts of Mr. Dreadin's testimony. This statement was later introduced in evidence by the State. The prosecution offered defense counsel a typed copy of the tape. Counsel for the defense pointed out that it was not signed or dated. However, the typed copy was offered to defense counsel for use in cross-examination of Mr. Dreadin. This transcript of the tape served little purpose, as defense counsel stated during the hearing on the motion for a new trial the tape recording agreed with Mr. Dreadin's testimony.
From these facts arise the claim by appellant of a denial of a fair trial. Despite the fact that the transcript of the tape was not put into evidence, was not signed or authenticated in any way, and was supplied to the defense for use on cross-examination, appellant still asserts unfairness. The tape and the transcription not being signed or otherwise authenticated was no more than the work product of the prosecution in an interview with a State witness. It was not a "statement" within the cases of Cooks v. State, 50 Ala.App. 49, 276 So.2d 634, and Fortenberry v. State, 55 Ala.App. 1, 312 So.2d 573.
Since the transcript of the tape was consistent with Mr. Dreadin's testimony by appellant's counsel own admission, it was of no value at all to the defense since no impeachment is possible from a prior consistent statement.
In Cooks v. State, supra, the rule is stated to be:
"The first requisite necessary to secure for inspection production of a `statement' of a witness for use on cross-examination of the witness is that the statement must be one in writing prepared by him or prepared by another at his instance and signed by him or otherwise authenticated by him."
To like effect are the cases of Parker v. State, 266 Ala. 63, 94 So.2d 209, and Caldwell v. State, 282 Ala. 713, 213 So.2d 919.
In the light of the foregoing authorities it is clear that the prosecution did not act improperly and, more importantly, the defense was in no way prejudiced by not receiving the tape transcript until the date of trial.
Appellant claims that it was reversible error to refuse written charge number 11. Said charge reads as follows:
"I charge you, members of the jury, that if Johnny Harris, was not intending any wrong, was swept along by a party of persons whom he could not resist, he would not be responsible for any wrong done if he was compelled to do the said wrong by the threats on the part of the said offenders instantly to kill him or to do him grevious (sic) bodily injury if he refused to do so." *475 The above charge is confusing and misleading. It is abstract in the extreme as it completely ignores the evidence in this case. It is also an incorrect statement of the law on compulsion in the commission of a homicide under the law of this state.
In Arp v. State, 97 Ala. 5, 12 So. 301, the Supreme Court said:
"The authorities seem to be conclusive that at common law no man could excuse himself, under the plea of necessity or compulsion, for taking the life of an innocent person."
In Leonard v. State, 217 Ala. 60, 114 So. 798, the Supreme Court reaffirmed Arp v. State, supra, and quoted from that case as follows:
"`Aside from the common-law rule that compulsion does not justify taking the life of an innocent person, an instruction to the jury that the deliberate killing of an innocent person under threats of impending peril to the slayer's life, proceeding from other parties, such as to take away his free agency, is excusable, is properly refused when it ignores evidence of an opportunity for him to escape after being informed that he must perpetrate the homicide.'"
By appellant's own testimony he knew of the plan to kill one or more of the prison guards several days prior to Mr. Barrow's death on January 18, 1974. He was a "flunky", had free run of the segregation hallways, and could have easily alerted the prison officials of the impending riot. He chose not to do so and became a willing participant in the riot by opening the cell doors and thus freed 30 to 40 inmates to take part in the riot. He did not testify that he was threatened with death if he did not comply with the orders given him to "roll" the cell doors but only that if he refused "they would deal with me."
The Warden testified that appellant had a weapon. Guard Arthur Dreadin testified that appellant had a weapon at the very beginning of the riot. The testimony of inmate Jewel Thomas indicated appellant was armed and was an active participant during the riot. The only testimony which in any way rebuts appellant's being armed and a willing participant in the riot was that of appellant himself.
Appellant was not denied due process where the State did not provide funds for the employment of a special investigator to aid him in procuring witnesses in his defense. Tillis v. State, 292 Ala. 521, 296 So.2d 892.
Alabama does not presently have a statute like the Criminal Justice Act which is applicable only to the federal system. This is a matter for the Legislature and not the courts.
We hold that the trial court did not abuse his discretion in permitting the State to call the widow of the deceased to prove his full name as laid in the indictment, and that he was killed on January 18, 1974, the day of the riot at Atmore Prison. There was absolutely no attempt to evoke sympathy through Mrs. Barrow's testimony. No questions were asked Mrs. Barrow which were not necessary to prove the material allegations of the indictment.
The sentence of death is not cruel and unusual punishment within the meaning of the Eighth and Fourteenth Amendments to the United States Constitution or Section Fifteen of the Constitution of Alabama.
In Furman v. Georgia, supra, Mr. Justice Stewart in his concurring opinion held:
"Legislaturesstate and federalhave sometimes specified that the penalty of death shall be the mandatory punishment for every person convicted of engaging in certain designated criminal conduct. Congress, for example, has provided that anyone convicted of acting as a spy for the enemy in time of war shall be put to death. The Rhode Island Legislature has ordained the death penalty for a life term prisoner who commits murder. Massachusetts has passed a law imposing the death penalty upon anyone convicted of murder in the commission of a forcible rape. An Ohio law imposes the mandatory penalty of death upon the assassin of *476 the President of the United States or the Governor of a State.
"If we were reviewing death sentences imposed under these or similar laws, we would be faced with the need to decide whether capital punishment is unconstitutional for all crimes and under all circumstances. We would need to decide whether a legislaturestate or federal could constitutionally determine that certain criminal conduct is so atrocious that societys' interest in deterrence and retribution wholly outweighs any considerations of reform or rehabilitation of the perpetrator, and that, despite the inconclusive empirical evidence, only the automatic penalty of death will provide maximum deterrence.
"On that score I would say only that I cannot agree that retribution is a constitutionally impermissible ingredient in the imposition of punishment. The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they `deserve,' then there are sown the seeds of anarchyof the self-help, vigilante justice, and lynch law."
Although Mr. Justice White joined in the reversal of Furman, he wrote:
"In joining the Court's judgments, therefore, I do not at all intimate that the death penalty is unconstitutional per se or that there is no system of capital punishment that would comport with the Eighth Amendment."
In Jefferson v. Commonwealth, 214 Va. 747, 204 S.E.2d 258, the Supreme Court of Virginia in 1974 had before it a mandatory death statute similar to Title 14, Section 319, Code of Alabama 1940. In Jefferson the Court said:
"Malcolm Marvin Jefferson was convicted in the trial court of killing a prison guard. At the time the offense was committed defendant was an inmate of a Virginia penal institution. He appeals the judgment of the trial court imposing the death penalty, fixed by the jury's verdict and made mandatory by statute. Code § 53-291.
"Code § 53-291 provides, in pertinent part:
"`It shall be unlawful for an inmate in a penal institution as defined in § 53-9 or in the custody of any employee thereof to do any of the following:
"(1) To kill, wound or inflict bodily injury upon (a) such employee or (b) any other person lawfully admitted to such penal institution, except another inmate, or (c) who is supervising or working with inmates; or
"`(2) To escape from such penal institution or from any person in charge of such inmate; or
* * * * * *
"`An inmate guilty of such killing as is mentioned in this section, or any act therein mentioned from which death ensues to such employee or person shall be guilty of first degree murder and be punished by death . . . .'
"(1) The defendant argues that the death penalty is cruel and unusual punishment, is unconstitutional per se and prohibited by the Eighth Amendment to the United States Constitution, a position in which he finds support from only two Justices of the majority in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). We have considered and rejected the argument advanced by the defendant on many past occasions, most recently in Bloodgood v. Commonwealth, 212 Va. 253, 183 S.E.2d 737 (1971), and Fogg v. Commonwealth, 208 Va. 541, 159 S.E.2d 616 (1968). Nothing has transpired since Bloodgood and Fogg, including the decision in Furman, to impair the validity of our holding that the death penalty is not unconstitutional per se. We affirm that holding here.
"(2) The defendant acknowledges that Furman deals with discretionary imposition of the death penalty and is limited to a statutory scheme which allows an arbitrary selective process to determine whether a defendant found guilty of a *477 capital crime will receive a death sentence or some lesser penalty.
"While conceding that death is the only penalty which may be imposed upon conviction of killing a prison guard under Code § 53-291, Brown v. Commonwealth, 132 Va. 606, 111 S.E. 112 (1922), the defendant argues that `the statute's operation inevitably requires the exercise of a broad range of uncontrolled selective discretion' by Commonwealth's attorneys and trial judges and that the Governor of Virginia could extend executive clemency. He contends this discretionary authority invalidates Code § 53-291 under Furman.

"The substance of this argument is that a statute imposing the death penalty is constitutionally infirm under Furman where any discretion may be exercised by any authority at any time, either before, during or after trial.
"We do not so construe Furman. The constitutional infirmity there was found in the discretion exercised in fixing punishment, be it by a jury or a judge. Furman's application is thus limited to statutes which permit such discretion to be exercised."
Our cases of Bailey, Williams and Williams, supra, find full support in Jefferson, supra, that the death penalty is not unconstitutional per se. Nothing said in Furman is to the contrary. Our mandatory death statute is not arbitrary, rare or selectively imposed within the meaning of Furman.
The fact that Judge Clark saw fit to charge the jury on all lesser include offenses in the indictment charging murder in the first degree did not in any manner change the mandatory death sentence provided for in Title 14, Section 319, Code of Alabama 1940. Appellant received much more than was his due in the Court's oral charge to the jury. On this score he has nothing to complain about. Appellant received a fair and impartial trial. He was due this and nothing more.
There was no eye witness testimony to the effect that appellant actually killed Mr. Barrow by stabbing him with a knife. Such proof was not necessary. In Stokley v. State, 254 Ala. 534, 49 So.2d 284, the Supreme Court said:
"It is well established that when, by prearrangement or on the spur of the moment, two or more persons enter upon a common enterprise or adventure and a criminal offense is contemplated, then each is a conspirator, and if the purpose is carried out, each is guilty of the offense committed, whether he did any overt act or not. This rests on the principle that one who is present, encouraging, aiding, abetting, or assisting, or who is ready to aid, abet, or assist the other in the perpetration or commission of the offense, is a guilty participant, and in the eye of the law is equally guilty with the one who does the act. Such community of purpose or conspiracy need not be proved by positive testimony. It rarely is so proved. The jury is to determine whether it exists, and the extent of it, from the conduct of the parties and all the testimony in the case. Morris v. State, 146 Ala. 66, 41 So. 274, and cases cited; Jones v. State, 174 Ala. 53, 57 So. 31; Teague v. State, 245 Ala. 339, 16 So.2d 877.
"When two or more persons enter upon an unlawful purpose, with a common intent to aid and encourage each other in anything within their common design, they are each responsible, civilly and criminally, for everything which may consequently and subsequently result from such unlawful purpose, whether specifically contemplated or not. Jones v. State, supra; Jolly v. State [94 Ala. 19, 10 So. 606] supra; Tanner v. State, 92 Ala. 1, 9 So. 613."
The date for the execution of the sentence of the law having passed, it is ordered that Friday, April 16, 1976, be and is set for the execution of such sentence. It is further ordered and adjudged by the Court that the date of sentence herein set be and the same is hereby suspended pending a final determination of this case.
Affirmed.
*478 All the Judges concur, except CATES, P.J., who concurs specially with opinion.
CATES, Presiding Judge (concurring specially):

I
At this stage of the prosecutions arising out of this prison riot, I fail to seein view of the long statute of limitationthat this is a selective discriminatory prosecution as referred to in the plurality opinion in Simonetti v. City of Birmingham, 55 Ala.App. 163, 314 So.2d 83.

II
This electrocution case originated under an indictment laid under Code 1940, T. 14, § 319. It went to the jury under a charge on first degree murder with death as the only penalty. However, the trial judge gave optional verdicts for second degree murder and for voluntary and involuntary manslaughter. R. 953-959. Defense counsel told the trial judge on being asked if he excepted, "the defendant is very satisfied." Thus, the charge became the law of the case.
However, I cannot square this charge with Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, as applied by the Supreme Court of Alabama in Hubbard v. State, 290 Ala. 118, 274 So.2d 298, and in Lokos v. State, 290 Ala. 122, 274 So.2d 303. As I understand, albeit dimly, at least three of the majority in Furman, supra, would eliminate from a trial court's considerationeither by judge or juryany discretion in selecting capital punishment after a finding of guilt. If this view prevails in Fowler v. North Carolina (to be argued in this term of the United States Supreme Court) then the verdicts for second degree (i. e. Common Law) murder and manslaughter were improvidently submitted to the jury. See Heflin, C. J., Coleman, McCall and Faulkner, JJ., in dissent in Swain v. State, 290 Ala. 123, 274 So.2d 305, where the majority in a rape case commuted a death sentence to life imprisonment.
Except for limitation to a life termer, though including a parolee, (Pinkerton v. State, 29 Ala.App. 472, 198 So. 157), § 319, supra, is the same as the North Carolina statutes as construed in State v. Waddell, 282 N.C. 431, 194 S.E.2d 19; State v. Fowler, 285 N.C. 90, 203 S.E.2d 803.

III
This is a stare decisis court with the additional statutorily imposed duty to follow the prior rulings of the Supreme Court of Alabama. Before Furman, supra, our senior brethren in McCants v. State, 282 Ala. 397, 211 So.2d 877 and Taylor v. State, 282 Ala. 673, 213 So.2d 836, had found jury fixed punishment constitutional and not a species of cruel and unusual punishment. We think those opinions implicitly and necessarily (under the Automatic Appeal Act as to McCants) construed both the State (§ 15) and Federal (Amendment 8) constitutions. Furman, supra, has cast doubt on what the Fourteenth Amendment translates of the Eighth to homogenize State criminal procedure in derogation of the Tenth Amendment.
If Furman, supra, is modified, then Taylor and McCants, supra, must be reexamined. The impending effectiveness in March, 1976, of our new aggravated murder statute (Act 213, September 9, 1975) makes me hesitant to release any decision in this heinous case.
The past thirty years have shown us that Federal Habeas Corpus is a shibboleth to open or close State prison doors. In the hope of economy of judicial work I would prefer to ruminate and prolong gestation, but my brethren would proceed instanter and place the offspring on the doorstep of the Supreme Court of Alabama for further nurture.
Aside from the Furman cloud I cannot say they are wrong. "* * * The power of the legislature except as limited by constitutional provisions is as plenary as that of the British Parliament. * * * "Harwood, J., in Co. Bd. of Education v. Citizens and Taxpayers, 276 Ala. 472, 163 So.2d 629.
The highest courts of California and Massachusetts have construed their state constitutions' cruel or unusual clauses as denying the legislature Austinian powers to prescribe mandatory capital punishment where *479 less restrictive or onerous means of deterrence can be reasonably envisaged. The debate on what does or does not deter evokes the saying, "The Sea of Speculation has no Shore."
Punishment must not be excessively painful, or demeaning to human dignity. Presumably, these considerations denominate torture, burning at the stake, crucifixion, and drawing and quartering, as "cruel and unusual." Compulsory suicide (e. g., Socrates) is a Schoolman's nightmare. I doubt if Kant or Hume could give us a formula.
If we go outside history (and, perhaps, into moral philosophy) to test clauses such as "cruel and unusual" against the "evolving standards of decency that mark the progress of a maturing society", Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 as to what those standards of decency are, or whether the mandatory imposition of the death penalty in a case such as this violates them, we tread into a disputatious quagmire. Taken from historical origins, and with little indication, either from the language itself or the circumstances of enactment, as to what the content of those words should be today, the temptation is great for a court simply to use a vague standard as a vehicle for its own contrivance of moral values.
The term "cruel and unusual punishment" has had many proffered meanings: one, that no illegal punishments may be imposed; another, that a punishment may not be grossly disproportionate to the offense. Weems v. U. S., 217 U.S. 349 at 367, 30 S.Ct. 544, 54 L.Ed. 793. While we may not articulate precisely, in terms of Lex Talionis, the death penalty is not grossly disproportionate to the crime of murder committed by an inmate during a riot upon a helpless prison custodian.
All this contention is probably an ephemeral exercise void of future usefulness not only on my part, but also of the whole court. I agree with Justice Reardon dissenting in Commonwealth v. O'Neal, Mass., 339 N.E.2d 676 wherein he remarked, "Common sense dictates that we wait until Fowler is decided." (Paraphrased.)